# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Karbin v. Karbin*, 2012 IL 112815

---

| | |
|---|---|
| Caption in Supreme Court: | JAN KARBIN, Appellee, v. MARCIA LOVENSON KARBIN, by and through her guardian, Kara Hibler, Appellant. |
| Docket No. | 112815 |
| Filed | October 4, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A guardian has authority to seek permission from the court to file a marriage dissolution petition on behalf of the ward if such petition is found to be in the ward's best interests—remand for "best interests" hearing and *In re Marriage of Drews*, 115 Ill. 2d 201 (1986), overruled. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. William S. Boyd, Judge, presiding. |
| Judgment | Judgments reversed.<br>Cause remanded. |

Counsel on
Appeal

Leslie J. Rosen, of Chicago, for appellant.

Jordan B. Rifis and Andrea M. Button Ott, both of Oak Park, for appellee.

Robert F. Harris, Charles Perez Golbert, Kass A. Plain and Mary Brigid Hayes, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Cook County Public Guardian.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1     In this case we consider whether we should overrule *In re Marriage of Drews*, 115 Ill. 2d 201 (1986), which held that a plenary guardian lacks standing to institute dissolution of marriage proceedings on behalf of the ward. For the reasons that follow, we believe a guardian has the authority to seek permission from the court to file a dissolution petition on behalf of the ward if such petition is found to be in the ward's best interests.

¶ 2                          BACKGROUND

¶ 3     Jan and Marcia Karbin were married on June 2, 1984. At that time, Marcia had one daughter, Kara, whom Jan adopted. They later had one child together, Jacob, who is mentally disabled and resides in a full-time care facility.

¶ 4     After a serious car accident in 1997, Marcia suffered brain damage and became totally disabled, requiring full-time care. Jan was appointed plenary guardian of Marcia's person and estate. For the next seven years, Jan provided for Marcia's needs in their home. Jan also established an annuity for Marcia's lifetime care out of the proceeds of a large personal injury settlement award resulting from the car accident.

¶ 5     By 2004, however, Jan could no longer care for Marcia due to his own Parkinson's disease, and transferred his plenary guardianship of Marcia to Kara. At the time of this transfer, the probate court approved a six-page settlement agreement signed by the parties. This agreement provided, *inter alia*, for the distribution of funds upon the sale of the parties' home, as well as the division of their joint accounts and personal effects. After the guardianship transfer, Marcia left Illinois to live with Kara in Ohio.

¶ 6     On November 9, 2007, after living apart for nearly three years, Jan petitioned the circuit court of Cook County for dissolution of his marriage. The petition alleged noncohabitation

-2-

and irreconcilable differences. On May 19, 2008, Marcia, through Kara, filed a verified counterpetition, alleging the same bases as Jan.

¶ 7 Discovery ensued. In 2009, Marcia filed a motion to compel discovery and petitioned the court for interim attorney fees and costs. Soon after, Jan moved for voluntary dismissal of his petition for dissolution. Jan alleged he had filed the petition at Kara's request, with the understanding that "each party would retain the assets and liabilities in their own name." Jan further claimed it was never his wish to divorce Marcia, but he had been willing to accommodate Kara's wishes as Marcia's guardian. Jan further claimed he had provided Marcia with a proposed marital settlement agreement, which Marcia ignored. Jan also filed a petition for temporary maintenance, interim attorney fees and costs.

¶ 8 In response, Marcia claimed that, based upon documents produced by Jan, it appeared he was concealing assets and income. Marcia further claimed that other documents showed that Jan had been romantically involved with another woman for some time, and that he and the woman were living together in a residence which Marcia believed Jan purchased with marital funds.

¶ 9 The litigation continued. Jan filed a motion to dismiss Marcia's motion to compel discovery. In his supporting affidavit, Jan stated that he believed that Marcia did not wish to pursue dissolution of her marriage.

¶ 10 Marcia moved to dismiss Jan's petition for temporary maintenance. She attached a copy of the warranty deed and mortgage for the property where Jan and the woman resided, which stated that they owned the property as a married couple. Marcia further alleged that Jan had numerous assets that he was attempting to conceal.

¶ 11 On July 29, 2009, the circuit court granted Jan's motion for voluntary dismissal of his dissolution petition. The court ordered that, in light of its dismissal, the parties were to be realigned, with Marcia as the petitioner and Jan as the respondent. The court also granted Marcia's motion to compel discovery.

¶ 12 On September 15, 2009, Marcia filed an emergency petition for a rule to show cause why Jan should not be held in contempt for his failure to comply with the July 29 court order. The next day, Jan filed his own emergency motion supported by an affidavit which stated that Marcia had told him that she did not wish to divorce him. Jan asked for appointment of a guardian *ad litem* to determine whether Marcia wished to continue with the dissolution proceedings.

¶ 13 Jan also filed a response to Marcia's motion to dismiss his petition for temporary maintenance and interim attorney fees. Jan admitted he had resided with another woman, but denied they were romantically involved. Jan claimed the woman was his live-in caregiver. He also denied that he knew the warranty deed and the mortgage to the property where they resided listed the woman as his wife. Although he admitted the couple had a joint checking account, he explained that he was often unable to write and that the joint account was simply a convenience.

¶ 14 On October 7, 2009, the circuit court ruled that Jan's motion to appoint a guardian *ad litem* should be heard in the court's probate division. Jan thereafter moved to dismiss Marcia's counterpetition, maintaining that pursuant to this court's decision in *In re Marriage*

*of Drews*, 115 Ill. 2d 201 (1986), Kara, as Marcia's plenary guardian, had no authority to pursue a dissolution proceeding on Marcia's behalf. Marcia responded by alleging that Jan's motives for requesting dismissal of her counterpetition were "purely financial in nature, as Jan would stand to inherit from Marcia's estate in the event of her death."

¶ 15    On January 5, 2010, the probate court held that Kara had no standing to file a petition for dissolution of marriage on Marcia's behalf. Thereafter, on April 30, 2010, the judge in the domestic relations case ruled that under *Drews*, "a guardian does not have the authority to litigate a dissolution of marriage action as a petitioner" and granted Jan's motion to dismiss Marcia's counterpetition.

¶ 16    Marcia appealed. A majority of the appellate court panel affirmed, holding that *Drews* controlled. 2011 IL App (1st) 101545. In dissent, Justice Cahill believed *Drews* to be factually distinguishable. *Id.* ¶ 34 (Cahill, J., dissenting).

¶ 17    We allowed Marcia's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We subsequently granted the Cook County public guardian leave to submit an *amicus curiae* brief on Marcia's behalf. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 18                                    ANALYSIS[1]

¶ 19    We believe, initially, that an overview of the Probate Act's adult guardianship provisions is helpful for a complete understanding of the issue before us.

¶ 20    Article 11a of the Probate Act provides for appointment of guardians for disabled adults. The Act defines a "disabled person" to include anyone over the age of 18 who "is not fully able to manage his person or estate" because of "mental deterioration," "physical incapacity," "mental illness," or "developmental disability." 755 ILCS 5/11a-2 (West 2008). A court may find that a person is "disabled" if such disability has been established by clear and convincing evidence. 755 ILCS 5/11a-3(a) (West 2008).

¶ 21    Once a disability is found, the court has different options available under the Act. A guardian of the ward's person is to be appointed when the ward "lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person." *Id*. A guardian of the ward's estate is to be appointed when the ward is "unable to manage his estate or financial affairs." *Id*. A guardian of both the ward's person and estate is to be appointed when the ward can manage neither personal nor financial matters. *Id*. Whatever the court's decision, the Probate Act directs that a guardianship "shall be utilized only as is necessary to promote the well-being of the disabled person, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum

---

[1]After we granted Marcia's petition for leave to appeal, Jan moved to dismiss Marcia's appeal on the basis that she failed to obtain permission from the circuit court to pursue this matter, as required pursuant to section 11a-18(a-5) (755 ILCS 5/11a-18(a-5) (West 2008)) of the Probate Act of 1975 (Probate Act). The record, however, contains an order entered by the probate court, dated October 8, 2010, which authorizes Kara to proceed with the retention of *pro bono* counsel to commence the appellate process. This order complies with the requirements of section 11a-18(a-5). Jan's motion to dismiss Marcia's appeal is therefore denied.

-4-

self-reliance and independence." 755 ILCS 5/11a-3(b) (West 2008). In all instances, the guardian is to act in the ward's "best interests." 755 ILCS 5/11a-17(e) (West 2008). Finally, in all matters, the provisions of the Act are to be "liberally construed to the end that controversies and the rights of the parties may be speedily and finally determined." 755 ILCS 5/1-9 (West 2008).

¶ 22    Here, Kara serves both as guardian of Marcia's person and her estate. Generally, a person serving in such dual capacities is referred to as a "plenary" guardian, meaning that she "can make decisions about both the ward's estate and the ward's person." Black's Law Dictionary 776 (9th ed. 2009). Thus, Kara is empowered under the Probate Act to make decisions regarding Marcia's "support, care, comfort, health, education and maintenance, and professional services as are appropriate" (755 ILCS 5/11a-17(a) (West 2008)), as well as with respect to the care and management of her finances (755 ILCS 5/11a-18(a) (West 2008)).

¶ 23    It was against this statutory backdrop that *In re Marriage of Drews*, 115 Ill. 2d 201 (1986), was decided. There, we held that a plenary guardian of a disabled adult does not have standing to initiate an action for the dissolution of a ward's marriage. *Id*. at 203. That case involved a mother who was named as plenary guardian for her son after he had suffered a head injury. After the son was abandoned by his wife, his guardian petitioned for dissolution of marriage, which the son's wife opposed. *Id*.

¶ 24    In ruling against the guardian, the court noted that a strong "majority rule" existed which held that "absent statutory authorization, a guardian cannot institute an action, on behalf of a ward, for the dissolution of the ward's marriage." *Id.* at 205.

¶ 25    The court looked to whether the General Assembly explicitly authorized the guardian of a person to so act. Section 11a-17 of the Probate Act states that such a guardian's duties include providing for the ward's "support, care, comfort, health, education and maintenance, and professional services as are appropriate." 755 ILCS 5/11a-17(a) (West 2008). The provision also directs the guardian to assist the ward in "the development of maximum self-reliance and independence." (Internal quotation marks omitted.) *Drews*, 115 Ill. 2d at 206. The court concluded that nothing in section 11a-17 provided the explicit authorization required under the traditional rule for a guardian to commence dissolution proceedings. *Id.*

¶ 26    The court also looked to section 11a-18, which specifies the duties of the guardian of the estate, including "the care, management and investment of the estate." 755 ILCS 5/11a-18 (West 2008). The court also found no explicit authorization in that provision. Indeed, the court concluded that when read together, both sections 11a-17 and 11a-18 "grant only limited standing related solely to matters directly bearing on the management of the ward's estate." *Drews*, 115 Ill. 2d at 206.

¶ 27    Marcia argues that soon after *Drews* was decided, this court abandoned the strict construction of sections 11a-17 and 11a-18 that had been embraced in that decision. Because that construction is inconsistent with our more recent interpretation of the same provisions, Marcia suggests that the usual *stare decisis* concerns are less compelling in this case and should not serve to prevent this court from overruling *Drews*.

¶ 28    The *stare decisis* doctrine expresses the policy of the courts to stand by precedents and

not to disturb settled points. *People v. Colon*, 225 Ill. 2d 125, 145 (2007); *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004); *Wakulich v. Mraz*, 203 Ill. 2d 223, 230 (2003). The doctrine is not so rigid, however, that it will prevent a court from overruling prior decisions when good cause exists to do so. *People v. Sharpe*, 216 Ill. 2d 481, 520 (2005); *Colon*, 225 Ill. 2d at 146.

¶ 29    One of the tenets of *stare decisis* is that the law will not change erratically, but will develop in a principled, intelligent manner. See, *e.g.*, *Colon*, 225 Ill. 2d at 146. As we explain below, however, our case law concerning the construction of sections 11a-17 and 11a-18 has not been consistent with the narrow construction given to those provisions in *Drews*.

¶ 30    As noted, *Drews* held that the guardianship provisions of the Probate Act "grant only limited standing related solely to matters directly bearing on the management of the ward's estate." *Drews*, 115 Ill. 2d at 206. Nevertheless, this court some three years later abandoned the notion that decisions which fall outside this limited area must be expressly authorized by the legislature. In *In re Estate of Longeway*, 133 Ill. 2d 33, 45-46 (1989), this court read section 11a-17 expansively to authorize a plenary guardian to make the decision on behalf of the ward regarding the use of life-sustaining measures. The following year, this court reaffirmed the reasoning of *Longeway* in *In re Estate of Greenspan*, 137 Ill. 2d 1, 16 (1990). In both cases, the court rejected arguments that under *Drews*, the Probate Act did not provide a guardian with the authority to consent to removal of life support. In siding with the guardian, this court offered no explanation as to why the provisions of the Probate Act which were narrowly construed in *Drews* were now broadly viewed as empowering a guardian "to perform an act which is within the implied authority granted by the Probate Act." *Longeway*, 133 Ill. 2d at 46; *Greenspan*, 137 Ill. 2d at 13. The court thus relied on the notion of "implied authority" rather than requiring only explicit authority in determining the power of a guardian to act under the Probate Act.

¶ 31    This court's next opportunity to interpret these same guardianship provisions of the Probate Act came in *In re Marriage of Burgess*, 189 Ill. 2d 270 (2000). There, after the husband had filed a petition for dissolution, he was adjudicated to be disabled, and his sister was appointed his plenary guardian. *Id*. at 271. The wife then moved to dismiss the dissolution action pursuant to *Drews*. *Id*. By way of a certified question, the appellate court, relying on *Drews*, held that the guardian could not maintain the husband's action. *Id*. at 271-72.

¶ 32    This court, however, found *Drews* factually distinguishable on the basis that in that case the guardian petitioned to institute the dissolution action on the ward's behalf, whereas in *Burgess* the guardian merely continued a dissolution action previously begun by a ward prior to incapacity. *Id*. at 271. Notwithstanding the factual distinction, the court's analysis did not end there, but went further. Commenting on the broad powers given to a guardian under sections 11a-17 and 11a-18 of the Probate Act, the court construed these provisions in a manner opposite the construction afforded the identical provisions in *Drews*. Rather than accepting *Drews*' interpretation of the powers conferred to guardians under the Probate Act as being exclusive or limiting, the court interpreted those powers broadly, concluding that, although not specifically stated in the statute, a guardian's authority to maintain a dissolution action on behalf of a ward "may be implied" from these provisions. *Id*. at 277. With respect to section 11a-17(a), the court determined that the statute provided a "broad description of

a guardian's powers" (*id.* at 278), from which the authority of a guardian to continue a dissolution action on behalf of a ward may be implied. In direct contrast to *Drews*, the court acknowledged that "[t]he status of a ward's marriage impacts the ward's support, care, comfort, and development of self-reliance and independence," which we held were "areas in which a guardian may be empowered to act under [section 11a-17](a)." *Id.* at 278. In recognizing that the status of a ward's marriage was an area that concerned the ward's person, the court relied on both *Longeway* and *Greenspan*, which held that guardians have the authority to "make such decisions under section 11a-17 even though the power to do so is not specifically enunciated." *Id.* at 273 (citing *In re Estate of Longeway*, 133 Ill. 2d at 45-46, and *In re Estate of Greenspan*, 137 Ill. 2d at 16-18).

¶ 33    Since *Burgess*, our appellate court has also applied the "implied authority" construction of the guardianship statute rather than *Drews*' narrow construction. For example, in *In re Estate of K.E.J.*, 382 Ill. App. 3d 401 (2008), the court held that under the provisions of section 11a-17(a) of the Probate Act, a guardian may seek to have a ward undergo involuntary sterilization.

¶ 34    This review of the case law concerning the construction of these provisions of the Probate Act confirms that the court has moved away from requiring explicit grants of statutory authority in order for a guardian to act, instead allowing "implied authority" to suffice. The decisions, as noted, do not explain what caused the court to depart from the view embraced in *Drews*. This survey further reveals a shift in the court's views regarding the effect of the status of the ward's marriage on the ward. In *Burgess*, we recognized the direct impact that status has on numerous personal aspects of the ward, including her support, care, comfort, and development of self-reliance and independence, all which trigger the authority of the guardian to act on the ward's behalf. *Burgess* thus contradicted *Drews*' view that the guardian was empowered only to act on behalf of the ward in matters of the ward's estate. Again, the decisions supply no explanation for this shift. Thus, we agree with Marcia that inconsistencies exist and that no principled reason for these inconsistencies is apparent.

¶ 35    Jan concedes that the case law interpreting the guardian's powers relating to decisions of a personal nature is inconsistent. He asserts, however, there are legitimate reasons that support maintaining the traditional rule that a plenary guardian may not bring dissolution proceedings on behalf of the ward. He argues that a guardian can never be sure that divorce conforms to the disabled spouse's true wishes and it is for this reason alone that *Drews* should be reaffirmed.

¶ 36    Although *Drews* cited to Illinois' recognition of the "majority rule," the court did not speak to the rule's origin or the rationale underpinning it. Rather, the court cited with approval several decisions from other states, two of which best express the rule's rationale. In *Wood v. Beard*, 107 So. 2d 198 (Fla. Dist. Ct. App. 1958), the court explained that the majority rule "is deeply embedded in the concept that a marriage relationship is exclusively personal and that it may be dissolved only by the voluntary consent and the comprehending exercise of the will of an *injured* spouse." (Emphasis added.) *Id.* at 199. The court provided further detail for the basis of the rule:

"No matter what the nature and the number of grievous wrongs committed by one

spouse against another, these of themselves cannot wreak the destruction of the marriage status. The marital wrongs create only the basis for the divorce action. It is the will and the decision of the injured one that invokes the judicial process. \*\*\* [T]here is woven into the marriage fabric, regardless of the marital grievance, the right by the aggrieved spouse to forgive or condone \*\*\*. For condonation to be effected, since the marriage status is so completely personal, the free exercise of the injured spouse's will and the prerequisite of comprehension are required." *Id*. at 199-200.

¶ 37 Similarly, in *Mohrmann v. Kob*, 51 N.E.2d 921 (N.Y. 1943), the New York Court of Appeals explained that the majority rule was grounded in the volition of the parties to end the marriage. Using as an example an instance where one spouse is unfaithful, the court stated that it is a "matter of choice by the innocent party \*\*\* whether the judicial process will be set in motion to bring about a severance of the marriage tie because of such infidelity." *Id*. at 924. The court observed that the injured spouse may choose to remain in the marriage "because of religious affiliation or for other reasons which satisfy the demands of good conscience." *Id*. Accordingly, where the injured spouse is incompetent and cannot intelligently make that choice, the rule provides that no other person—including a guardian—can exercise that option. *Id*. at 926 (Thacher, J., dissenting, joined by Rippey, J.).

¶ 38 Thus, because the decision to divorce was viewed as a uniquely personal matter, oftentimes involving religious and moral precepts, courts were reluctant to have others speak for an incompetent adult in such situations. The rule reflected the view that "marriage is sacred and that only the most serious of marital offenses should be grounds for divorce." Kurt X. Metzmeier, Note, *The Power of an Incompetent Adult to Petition for Divorce Through a Guardian or Next Friend*, 33 U. Louisville J. Fam. L. 949, 951-52 (1995). This view also went hand-in-hand with the policy that ending a marriage required a legal injury in which the court would assign blame or fault to a specific spouse. The rule, therefore, comported with those states in which the sole grounds for divorce laws were predicated upon concepts of fault and injury, as was the case in Illinois prior to the enactment of the no-fault provisions of the Illinois Marriage and Dissolution of Marriage Act. In such states, only the injured spouse could seek a divorce.

¶ 39 With the enactment of the no-fault provisions in 1984, the General Assembly signaled a shift in the policy regarding the grounds which must exist in order for a dissolution to be granted. The passage of the no-fault provisions reflected a dissatisfaction with the traditional requirements of proving fault to obtain a divorce. Indeed, the comments of the legislation's sponsor at the time reveal that the concept of fault in divorce actions had led to a wide variety of problems, including parties "perjur[ing] themselves on the stand in order to find fault grounds, when in fact, they just want to get out [of the marriage]." See 83d Ill. Gen. Assem., Senate Proceedings, May 27, 1983, at 226 (statements of Senator Marovitz). According to the sponsor, Illinois' enactment of no-fault divorce allowed people "to part with dignity." *Id*. at 226-27.

¶ 40 Although *Drews* was decided in 1986, our review of the appellate court's decision in that case reveals that the dissolution petition at issue was filed prior to the enactment of the new no-fault law. See *In re Marriage of Drews*, 139 Ill. App. 3d 763, 765-66 (1985); see also 750

ILCS 5/401(a)(2) (West 2008) (reflecting that the no-fault amendment became effective July 1, 1984). Thus, the court in *Drews* did not have to reconcile what impact, if any, the new legislation had on the continued application of the traditional rule.

¶ 41    That question, however, is squarely presented in this case. Illinois' recognition of no-fault divorce places it amongst those jurisdictions which, while acknowledging the state's interest in the stability of marriage, eliminated "the traditional concept that divorce is a remedy granted to an innocent spouse." Uniform Marriage and Divorce Act, Prefatory Note, 9A U.L.A. 147, 148 (1987); see also Mark Schwarz, Note, *The Marriage Trap: How Guardianship Divorce Bans Abet Spousal Abuse*, 13 J.L. & Fam. Stud. 187, 191 (2011) (noting the "broad social destigmatization of divorce" accomplished through the adoption of "no-fault statutes and/or vastly broader grounds for divorce").

¶ 42    With the concept of "injury" removed from divorce in Illinois, it is difficult for us to accept the view that the decision to divorce is qualitatively different from any other deeply personal decision, such as the decision to refuse life-support treatment or the decision to undergo involuntary sterilization. Each of these latter decisions can rarely be undone. The same cannot be said for the decision to divorce—if the disabled adult regains competency and disagrees with the guardian's decision, remarriage to the former spouse may be possible. Thus, there is no reason why the guardian should not be allowed to use the substituted-judgment provisions found in section 11a-17(e) of the Probate Act to make all types of uniquely personal decisions that are in the wards's best interests, including the decision to seek a dissolution of marriage. Under our modern legal framework, "[i]f one party to a marriage need not be 'at fault,' and divorce is arguably more 'acceptable' in American society, it is not inconceivable that elderly, mentally incapacitated, or mentally ill individuals could *want* or *need* to institute divorce proceedings, where historically their wants or needs were legally irrelevant or dismissed as unascertainable." (Emphases in original.) Diane Snow Mills, Comment, *"But I Love What's-His-Name": Inherent Dangers in the Changing Role of the Guardian in Divorce Actions on Behalf of Incompetents*, 16 J. Am. Acad. Matrimonial Law, 527, 528-29 (2000).

¶ 43    In light of the above, we cannot agree with Jan that policy considerations regarding divorce compel our reaffirmation of *Drews*. As is apparent, the traditional rule espoused in *Drews* is no longer consistent with current Illinois policy on divorce as reflected in the Illinois Marriage and Dissolution of Marriage Act.

¶ 44    We also note that the continued application of the traditional rule results in an inequity to disabled spouses that conflicts with the policy underlying our Probate Act. Under the traditional rule, a disabled spouse under a guardianship "is helpless to change the situation if his or her competent spouse does not want a divorce. The incompetent, vulnerable spouse is trapped in an unwanted, potentially abusive, marriage." Schwarz, *supra*, at 188. As another commentator has observed: "To provide a mentally competent spouse with [the power to bring a divorce action against an incompetent spouse] in the absence of a corresponding power to the incompetent to seek divorce (through a guardian) is to grant the competent spouse 'absolute, final control over the marriage,' leaving 'an incompetent spouse completely at the mercy of a competent spouse' to the marriage contract. Principles of equity demand equal treatment and equal access to the courts for all individuals, not just those who

are sane ***." Mills, *supra*, at 548-49.

¶ 45   Accordingly, if we were to agree with Jan and reaffirm *Drews*, we would be allowing the law to unfairly treat incompetent spouses, leaving them at the complete mercy of the competent spouse without consideration of their best interests. This situation stands in direct contravention of the policy of our state, which provides that once a person is found to be "disabled" under our Probate Act, he or she is viewed as " 'a favored person in the eyes of the law' and is entitled to vigilant protection." *In re Mark W.*, 228 Ill. 2d 365, 374-75 (2008) (quoting *In re Estate of Wellman*, 174 Ill. 2d 335, 348 (1996)). Indeed, guardianship is intended to "promote the well-being of the disabled person, [and] to protect him from neglect, exploitation, or abuse." 755 ILCS 5/11a-3(b) (West 2008). It is for these reasons that we disagree with Jan's contention that *Drews* comports with current Illinois policy reflected in the Probate Act concerning disabled spouses.

¶ 46   We note that, in so holding, we reject Jan's assertion that the General Assembly's amendment in 2000 of section 11a-17 indicates the legislature's rejection of the notion that a guardian may also institute dissolution proceedings on the ward's behalf.[2] Jan contends that this amendment indicates that the narrow construction given to section 11a-17 in *Drews* comports with the legislature's intent that implied authority under the provisions does not exist.[3]

¶ 47   Jan overlooks that section 11a-17 was amended by the General Assembly before our decision in *Burgess* was announced. As noted, *Burgess* broadly construed the provisions of section 11a-17. If the legislature had a disagreement with our statutory construction in *Burgess*, it could have thereafter amended the statute in the manner that Jan suggests. It did not. Moreover, in the time since *Burgess* was announced, *In re K.E.J.* was decided by the appellate court. In that decision, the court used the notion of section 11a-17's implied authority to provide a guardian with the power to request sterilization of the ward. In the years that followed, the legislature has not taken action to indicate its disapproval of the

---

[2]We note that during the briefing of this matter, Jan filed a motion, pursuant to Supreme Court Rule 341(h)(7), to strike certain paragraphs of Marcia's reply brief which related to his legislative argument. The challenged paragraphs in Marcia's brief referenced then-pending Senate Bill 2547, which proposed to amend section 11a-17 of the Probate Act to allow a guardian to file a dissolution petition and the circuit court to determine, on a case-by-case basis, whether dissolution of marriage is in the best interests of the ward. Marcia also attached a copy of the proposed statute to her brief. We took Jan's motion to strike with this case and now deny it. Rule 341(h)(7) provides that points not argued in the appellant's initial brief shall not be raised in the reply brief. However, Marcia's reference to the proposed legislation was only in response to Jan's argument raised in his appellee's brief. Further, this court may take judicial notice of the fact that legislation was pending at the time of briefing.

[3]The amendment provided the guardian of the person the authority to "maintain" a dissolution action "[i]f the ward filed a petition for dissolution of marriage *** before the ward was adjudicated a disabled person." 755 ILCS 5/11a-17(a-5) (West 2008).

-10-

judiciary's broad construction. Indeed, it codified the *K.E.J.* decision,[4] just as it codified our decision in *Longeway*.[5] Accordingly, the legislature acquiesced in this broad interpretation. See *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 404 (2005) (where the legislature chooses not to amend terms of a statute after judicial construction, it will be presumed that it has acquiesced in the court's statement of legislative intent).

¶ 48    We therefore reject any notion that policy, as reflected in either the Probate Act or the Marriage and Dissolution of Marriage Act, compels the continued application of the traditional rule cited in *Drews*. To do otherwise would mean that a guardian would be prevented from seeking permission from the court to bring an action for dissolution on behalf of an incompetent ward, even if the ward was in danger as a result of being in the marriage. Given that the purpose of the Probate Act is to protect the ward, we would contravene that purpose if we were to prohibit the exercise of the guardian's power in the best interest of the ward while endorsing a power imbalance against the incompetent spouse which could result in physical or emotional abuse, financial exploitation, or neglect of the incompetent spouse by the "competent" partner. By construing the Probate Act to prohibit a guardian from being able to seek permission from the court to bring a dissolution action on behalf of the ward, we would be improperly carving an exception to the broad powers of a guardian set forth by the General Assembly in the Probate Act. In our view, it is only by giving these provisions their full meaning that we can accomplish the legislature's intent to protect the vulnerable members of our society and to ensure their safety.

¶ 49    Whether a guardian is initiating, responding to, or continuing a dissolution action, the interests of the ward that may require protection remain constant, regardless of the procedural posture of the case. Because under the Probate Act the guardian must always act in the best interests of the ward, when a guardian decides that those best interests require that the marriage be dissolved, the guardian must have the power to take appropriate legal action to accomplish that end. We therefore find no compelling reason to treat a guardian's decision to seek court permission to institute a dissolution action on behalf of a ward any differently from the multitude of other innately personal decisions which may be made by guardians on behalf of their wards, including undergoing involuntary sterilization or ending life-support measures. All of these decisions made by guardians without knowing a ward's wishes are just as personal—if not more so—than the decision to seek a divorce. All also may implicate the ward's moral and religious beliefs. The provisions of our Probate Act cannot be so arbitrary as to empower a plenary guardian to make decisions with respect to all these matters except for the decision to end a marriage. Either the guardian can act in the best interests of the ward for all personal matters, or for none at all.

¶ 50    This ensures that the most vulnerable members of our society are afforded fundamental fairness, equal protection of the laws (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) and equal access to the courts (U.S. Const., amend. I; Ill. Const. 1970, art. I, § 12). Therefore,

---

[4]755 ILCS 5/11a-17.1 (West 2010).

[5]755 ILCS 40/1 *et seq.* (West 2008).

-11-

*In re Marriage of Drews*, 115 Ill. 2d 201 (1986), is hereby overruled.

¶ 51    By overruling *Drews*, we align Illinois with those states which allow a guardian to seek court permission to bring a dissolution action on behalf of a ward where not expressly barred or allowed by statute. See Schwarz, *supra*, at 188. We find persuasive opinions from other jurisdictions which have so held. See, *e.g.*, *In re Marriage of Ruvalcaba*, 850 P.2d 674 (Ariz. Ct. App. 1993); *Nelson v. Nelson*, 878 P.2d 335 (N.M. Ct. App. 1994); *In re Marriage of Ballard*, 762 P.2d 1051 (Or. Ct. App. 1988); *Wahlenmaier v. Wahlenmaier*, 750 S.W.2d 837 (Tex. Ct. App. 1988); *In re Marriage of Gannon*, 702 P.2d 465 (Wash. 1985) (*en banc*); see also David E. Rigney, Annotation, *Power of Incompetent Spouse's Guardian or Representative to Sue for Granting or Vacation of Divorce or Annulment of Marriage, or to Make Compromise or Settlement in Such Suit*, 32 A.L.R.5th 673, § 3(a) (1995) (collecting cases).

¶ 52    We therefore reverse the judgments of both the circuit and appellate courts and hold that Marcia's petition should be allowed to be filed. On remand, we direct the circuit court to hold a "best interests" hearing (see 755 ILCS 5/11a-17(e) (West 2008) (setting forth factors to be considered in determining the best interests of the ward)) in order to determine whether it is in Marcia's best interests to seek the dissolution of her marriage. In this regard, we note that under section 11a-17, the actions of the guardian are always subject to the supervision of the circuit court. 755 ILCS 5/11a-17(a) (West 1996); *Burgess*, 189 Ill. 2d at 281. Indeed, a "guardian only acts as the hand of the court and is at all times subject to the court's direction in the manner in which the guardian provides for the care and support of the disabled person." *In re Wellman*, 174 Ill. 2d at 347.

¶ 53    In our view, the circuit court's assessment of the petition for dissolution filed by a guardian on behalf of a ward pursuant to the standards set forth in section 11a-17(e) provides the needed procedural and substantive safeguards to ensure that the best interests of the ward are achieved while preventing a guardian from pursuing a dissolution of marriage for his or her own financial benefit, or because of the guardian's personal antipathy toward the ward's spouse. To further safeguard the interests of all parties involved, we agree with Marcia that the guardian must satisfy a clear and convincing burden of proof that the dissolution is in the ward's best interests. We believe a heightened burden is appropriate because "[c]ases involving the dissolution of an incompetent spouse's marriage *** present issues involving personal interests more complex and important than those typically presented in a civil lawsuit." *Ruvalcaba*, 850 P.2d at 683; *cf. In re Longeway*, 133 Ill. 2d at 51 (requiring guardian to adduce clear and convincing evidence in determining a ward's intent regarding refusal or withdrawal of artificial sustenance); *In re Estate of K.E.J.*, 382 Ill. App. 3d at 415 (clear and convincing standard of proof required for guardian to establish sterilization is in ward's best interests because of the fundamental rights involved and to prevent abuse of judicial authority).

¶ 54                                   CONCLUSION

¶ 55    For the foregoing reasons, we reverse the judgments of the appellate and circuit courts. This cause is remanded to the circuit court for further proceedings consistent with this

opinion.

¶ 56        Judgments reversed.

¶ 57        Cause remanded.