NOTICE
Decision filed 11/16/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 170317

NO. 5-17-0317

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* GUARDIANSHIP OF LILLIAN BURDGE, a Disabled Adult | ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| (Michelle Anette Hagarty, Petitioner-Appellee and Cross-Appellant; Adelbert Burdge III, Counterpetitioner-Appellant and Cross-Appellee; Tena Payne, Appellee; and Toya Egbert, Cross-Appellee). | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 16-P-136 Honorable Stephen P. McGlynn, Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Presiding Justice Barberis and Justice Goldenhersh concurred in the judgment and opinion.

**OPINION**

¶ 1    The petitioner, Adelbert Burdge III (Butch), appeals the circuit court's order awarding the petitioners, Michelle Anette Hagarty (Anette) and Tena Payne, guardianship over the person of their mother, Lillian Burdge. Anette cross-appeals the circuit court's order awarding Butch guardianship over Lillian's estate. Anette also appeals the circuit court's order awarding Lillian's daughter, Toya Egbert, visitation with Lillian. For the following reasons, we affirm those portions of the circuit court's order awarding Anette and Tena guardianship over Lillian's person

1

and awarding Butch guardianship over Lillian's estate, but we reverse that portion of the circuit court's order awarding visitation for Toya.

¶ 2                                    BACKGROUND

¶ 3     Lillian was born on December 1, 1931. Lillian had worked as a nurse before she retired in 1996, and she and her husband had thereafter traveled by motor home until they settled in Texas, where her husband died in 2001. At the time of the hearings, Lillian was living in Illinois, was 85 years old, and suffered from moderate to severe dementia. Lillian has eight children: Anette, Tena, Joni Petterson, Toya, Butch, Michael Andrew Burdge (Andy), Terri Parkman, and Thomas R. Burdge (Robby).

¶ 4     On February 26, 2016, Anette filed a petition for adjudication of disability and for appointment of a guardian of Lillian's estate or person or both. 755 ILCS 5/11a-8 (West 2016). On March 22, 2016, Butch filed a motion to dismiss, or in the alternative, a counterpetition for guardianship. Butch attached an "Illinois Statutory Durable Power of Attorney for Health Care," dated February 27, 2009, wherein Lillian named Butch as her attorney-in-fact to "make any and all decisions *** concerning [her] personal care, medical treatment, hospitalization[,] and health care and to require, withhold[,] or withdraw any type of medical treatment, or procedure, even though *** death [may] ensue." Lillian named Terri as a successor attorney-in-fact. Lillian nominated the agent acting under the power of attorney as the guardian of her person, if one were to be appointed.

¶ 5     On February 10, 2017, the guardian *ad litem* (GAL) filed a preliminary report, noting that she had been appointed GAL on March 1, 2016. The GAL reported that Lillian had resided with Toya in Millstadt, Illinois, for eight years. The GAL reported that Lillian received approximately $3750 a month in veterans benefits, Social Security benefits, and other income. The GAL noted

that a physician's report by Mary C. Agne, M.D., revealed that Lillian required assistance with her self-care and management of her finances and that she was unable to make health care or financial decisions due to her impaired cognition related to moderate to severe mixed dementia.

¶ 6    The GAL reported that she had met with Lillian at Toya's home on March 16, 2016, and Lillian appeared clean and content. The GAL reported that Lillian's bed was in the dining room of the home, an area open to the kitchen and family room, and that Toya's home was cluttered and in need of a thorough cleaning. The GAL subsequently visited Toya's home on January 4, 2017. During this second visit, Lillian's bed was located in the family room, and her recliner and the television were located in the dining room area. The GAL noted that the home's clutter and lack of cleanliness were similar to the home's condition during the GAL's first visit. The GAL reported that some of Lillian's children (Anette, Tena, Joni, and Robby) were concerned that Toya was financially dependent on Lillian's income, that Toya abused prescription medication, and that Toya was either overmedicating Lillian or that Toya was taking Lillian's prescribed medications. The GAL preliminarily recommended that Anette be appointed as guardian of Lillian's person and Butch be appointed as guardian of Lillian's estate. The GAL further recommended that Lillian move to an assisted living facility.

¶ 7    On February 14, 2017, February 21, 2017, March 9, 2017, and March 21, 2017, the circuit court held hearings on the petitions filed by Anette and Butch. Attorney Robert A. Hayes testified that he had been Lillian's attorney in 2009, when she scheduled an appointment with him to prepare a health care power of attorney. Hayes testified that Lillian was lucid and competent and was very adamant that she wanted Butch to be her agent with power of attorney for health care. Hayes testified that he then prepared the aforementioned power of attorney, which Lillian executed on February 27, 2009.

3

¶ 8     Hayes testified that Toya later scheduled appointments for Lillian in 2014 and 2015, and Toya accompanied Lillian to the appointments. Hayes testified that he was contacted to respond to opposing counsel letters regarding the inability of Lillian's other daughters to visit with her. Hayes testified that Lillian expressed to him that she would make decisions as to whom she would visit, when she would visit them, and where she would visit them and that she did not appreciate her daughters' interference with her liberties. Hayes testified that at that time, he believed that Lillian was in full control of her mental facilities.

¶ 9     Robby testified that he was the youngest of Lillian's eight children, and he resided in Victoria, Texas. Robby testified that in 2001, he and his wife paid a down payment for a Texas home for his parents and that his father died shortly thereafter. Robby testified that, at that time, he shared a joint account with Lillian, where he deposited funds for her benefit, but in 2004, he noticed that funds were missing from the account. Robby questioned Terri and Toya, neither of whom were employed and both of whom he suspected, based on their appearance and conduct, were using illicit drugs, and Robby ultimately closed the account. Robby nevertheless continued to fund Lillian's expenses until Lillian moved from Texas to Illinois in 2009.

¶ 10    Robby testified that in January 2009, he discovered Lillian's Texas home torn apart and destroyed, with graffiti on the walls, and Lillian was gone. Robby testified that he knew that Lillian had planned to visit Illinois at some point in order to receive medical treatment, but he was unaware that she was leaving that day. Robby later learned that Butch had rented a U-Haul, and Terri and Toya had moved Lillian to Illinois.

¶ 11    Robby testified that since Lillian's move to Illinois, his contact with Lillian had been limited. Robby testified that between 2009 and 2015, he had visited with Lillian once, when he flew his family to Illinois to visit Lillian in the hospital. Robby testified that although he did not

4

get along with Butch, he believed that Butch was capable of handling Lillian's finances. Robby testified that Butch had the ability since 2009 to ensure that Lillian had access to all of her children, but he had failed to allow that communication. Robby testified that he had not visited Toya's home since 1998. Robby testified that he believed Toya used narcotics on a regular basis and smoked marijuana. Robby testified that Lillian had told him that she was concerned that Terri or Toya was taking her prescription medication because some of her pills were missing. Robby testified that he believed that Anette should be appointed guardian because she was a loving mother and wife, she was educated in the medical field, and she would allow all of Lillian's children to visit with her.

¶ 12     Joni testified that she was a registered nurse and an administrative supervisor at a hospital in Orlando, Florida. Joni testified that when her parents were traveling in a motor home during retirement, Lillian maintained primary care physicians and an orthopedic physician in Orlando, and she consulted Joni for medical recommendations. Joni testified that in 2006, Lillian stayed with her for two weeks, and Lillian told Joni that she suspected that Toya and Terri were taking her medication. Joni testified that during this visit, Terri and Toya telephoned four or five times a day, and Lillian told Joni that she wished they would stop calling her.

¶ 13     Joni testified that she further witnessed Lillian writing checks, including a $500 one, to Terri. Joni testified that Lillian had stated that she wished Toya and Terri would quit asking her for so much money. Joni testified that Lillian telephoned her in 2008, and Lillian was crying and saying, "This isn't what I want; I miss my son [Robby]." Joni testified that although Lillian had not yet moved to Illinois at the time of the phone call, Toya had been in and out of Lillian's home frequently. Joni testified that Terri and Terri's children were also there often. Joni testified that Lillian had told her she was tired of them being in her home so much.

¶ 14    Joni testified that in her professional opinion, the combination and quantity of methadone, hydrocodone, amphetamines, Valium, and Aricept, as prescribed to Lillian, was concerning. Joni testified that she had worked with patients suffering from sickle cell, chronic back pain, and cancer and had never seen patients treated with that combination of drugs before.

¶ 15    Joni testified that since Lillian had moved to Illinois, Toya had limited her contact with Lillian and had not allowed Joni one-on-one visits with Lillian. Joni testified that when she talked with Lillian on the telephone, she heard Toya in the background prompting Lillian to tell Joni that she liked where she was staying and that she did not want to see all her children constantly. Joni testified that in June 2009, she was visiting the area for four days, and Toya told Joni that if she wanted to visit with Lillian, she would have to meet her on the side of the highway. Joni testified that Toya finally agreed to allow them to take Lillian to a restaurant, and Toya and her family came into the restaurant and allowed them no private time to visit with Lillian.

¶ 16    Joni testified that in 2010, Lillian had planned to visit Joni in Orlando for a couple of weeks; however, Toya notified Joni that Lillian could not go because she had to go with Toya to Walt Disney World for a dance recital event. Joni noted that she lived 10 minutes from Walt Disney World and offered for Lillian to stay with her, but Toya refused. Toya later stopped by Joni's home with Lillian and Toya's family and visited for an hour. Joni explained that Toya controlled the situation, making visits with Lillian difficult. Joni testified that she had last arranged a visit with Lillian on November 5, 2016, but Toya never arrived with Lillian.

¶ 17    Joni testified that she called Lillian on her birthday in 2012, and Lillian told her that they had not celebrated and that she had been lying around. Joni testified that she was concerned that Toya was not properly caring for Lillian. Joni testified that she had expressed her concerns to

Butch, but Butch did not respond. Joni testified that she believed Anette should be guardian of Lillian's person and estate.

¶ 18    Tena testified that she had taught nursing for 22 years and had earned her doctorate in higher education. Tena testified that she had been the provost at West Kentucky Community and Technical College for the previous 10 years. Tena testified that she had lived in Paducah, Kentucky, for 40 years.

¶ 19    Tena testified that she enjoyed a good relationship with Toya until 2009, when Toya moved Lillian from Texas to Illinois without notifying Lillian's children. Tena testified that she had planned a visit with Lillian in 2009, but Toya would not allow Lillian to visit with Tena. Tena also testified that in December 2016, she and Anette were waiting at a restaurant as a result of a planned visit with Lillian, but Toya did not bring Lillian to visit, saying it was too cold. Tena testified that she had only seen Lillian five or six times since 2009, even though she had made many more attempts. Tena testified that she had not been in Toya's home since 2009.

¶ 20    Tena expressed concern with regard to Toya's handling of Lillian's finances, believing that Toya was financially dependent on Lillian. Tena testified that she became concerned about the financial exploitation in 2007 and 2008, when Terri and Toya "moved in a little bit and got into the money quite a bit." Tena testified that Lillian had received approximately $30,000 for a malpractice settlement, but Lillian had told Tena that she had given those funds to Toya to open a business, although she expected repayment. Tena further testified that Lillian's monthly income was being deposited into three accounts: one in Toya's name, another in Toya's and Lillian's names, and a third in Toya's daughter's name.

¶ 21    Tena also expressed concern with Lillian's living with Toya because Toya smoked "quite a bit of marijuana." Tena also testified that because Toya was not a health care professional, she

7

did not know about the care of the elderly or drug interactions. Tena testified that she believed Anette should be appointed as guardian of Lillian's person and estate. Tena testified that Anette's home was appropriate for Lillian because she could enter the home easily due to the lack of steps; Anette was available; Anette's husband, Jack, was available; and Lillian had an available bedroom, bathroom, great room, and kitchen. Tena testified that she planned to retire at the end of June 2017 and was looking forward to assisting Anette with Lillian's care.

¶ 22    Anette testified that she was 58 years old and was employed as a nurse practitioner. Anette testified that she was not notified that Lillian was moving from Texas to Illinois. Anette testified that from 2009 until 2014, she visited Lillian six times, even though she had attempted to visit more often, and that Toya had remained present during the visits. Anette testified that when she spoke with Lillian on the phone, she could hear Toya in the background telling Lillian what to say. Anette testified that Toya did not keep her updated on Lillian's medical condition.

¶ 23    Anette testified that on January 17, 2015, at about 2 p.m. she and her daughter made an unannounced visit to Toya's home. Anette testified that Toya's house was "a mess" with a "stench that smelled like dog poop." Anette testified that it was cluttered and "just awful." Anette testified that Lillian was still wearing her nightgown and was lying in her bed in the dining room area. Anette testified that Lillian had no privacy in the dining room of Toya's home. Anette identified pictures of Toya's home, revealing clutter, a fall hazard for Lillian, and trash by the front door.

¶ 24    Anette testified that she later attempted another unannounced visit and could hear Lillian through the door, but Toya answered the door and said Lillian was sleeping. Toya ultimately allowed Anette to enter, but Toya yelled in Lillian's face, "You tell her she can't come here any more unless she calls first." After about 15 minutes, Toya told Anette to leave. Anette testified

that Toya generally allowed Anette to spend two hours per visit with Lillian. Anette testified that when she returned thereafter to visit with Lillian, there was a locked fence around Toya's home, so she was unable to reach the front door.

¶ 25    Anette testified that at some point during the previous year, she had been sitting with Lillian at a luncheon, Toya walked away from the table, and Lillian asked Anette to help her. Despite a court order entered in September 2016, which granted Anette visitation time with Lillian at least one day a week, Toya had restricted Anette's visitation with Lillian to nine times in the 22-week period.

¶ 26    Anette testified that Lillian utilized three bank accounts in Illinois: one account in her and Toya's name, one account in Toya's name, and one account in Toya's daughter's name. Anette testified that in reviewing Lillian's banking documents, she identified checks that were ostensibly signed by Lillian, but the signature was not Lillian's. Anette testified that these funds were paid to Toya and her family. Anette also testified that Lillian had received $30,000 as a result of a medical malpractice claim, and these settlement funds were transferred to Toya to begin a business. Anette testified that Toya did not run a business, was not employed, and received her income from Lillian. Anette further testified that in late 2016 she met with Toya and smelled marijuana in her car.

¶ 27    Anette testified that she and Butch had a good relationship, but Anette testified that she had not been authorized to discuss Lillian's medical care with her physicians. Anette testified that upon reviewing Lillian's prescriptions, she noted that Lillian had been prescribed hydrocodone, methadone (prescribed for withdrawals from opiate drugs), and diazepam (Valium). Anette testified that the hydrocodone prescribed to Lillian was excessive and explained that elderly patients in their eighties could not process medications easily. Anette

9

testified that she could not determine when those combinations of drugs and in the amounts prescribed would be medically indicated on a long term basis. Anette testified that when prescribed diazepam, hydrocodone is contraindicated.

¶ 28    Anette testified that she sought guardianship for the person and estate of Lillian, in addition to residential placement authority. Anette testified that she worked part-time: Monday, Tuesday, Wednesday, and half-day on Thursday. Anette testified that her husband, children, and siblings were willing to help when she was working. Anette testified that she was also willing to hire professional help. Anette testified that she consumed one to two glasses of wine three to four times a week.

¶ 29    Toya testified that she had lived in Millstadt, Illinois, for over 20 years, that Lillian had lived with her since 2009, and that she properly cared for Lillian. Toya testified that with regard to Lillian's schedule, Lillian generally woke at 6 a.m. to take her thyroid medicine, go to the bathroom, and return to bed to nap. Toya testified that Lillian generally woke again about 8:30 a.m. to eat oatmeal and return to nap until 10 a.m. Toya testified that they began their day after that. Toya testified that Lillian generally settled to sleep at approximately 9 p.m., and Toya and Lillian woke at 2 a.m. to change Lillian and allow her use the bathroom before returning to sleep. Toya testified that she bathed Lillian and monitored her diet and energy levels. Toya testified that she prepared Lillian's oatmeal and helped her dress in the mornings. Toya testified that she took Lillian to her doctors' appointments and her once-a-week hair appointments. Toya testified that she also took Lillian with her when she traveled to Belleville or the Center of Creative Arts in St. Louis. Toya testified that she and Lillian played games and completed puzzles together.

¶ 30    Toya testified that Lillian suffered from dementia, rheumatoid arthritis, and spinal stenosis and had undergone knee-replacement surgery, bladder surgery, and a hysterectomy.

Toya testified that Lillian started having difficulties making decisions and caring for herself in March 2016. Toya testified that Lillian had not taken Valium for the last two years and that although Lillian had been prescribed methadone in Texas, she was no longer taking it either. Toya testified that Lillian was also no longer taking amphetamines.

¶ 31    Toya testified that she did not take any drugs that were not prescribed for her and had not smoked marijuana since her children were younger, over 20 years ago. Toya testified that she had adopted children and, as part of the adoption process, she was drug-tested. Toya testified that she took prescription medication that included "thyroid, Isosorbide, Savella, [and] [h]ydrocodone." Toya testified that she was prescribed three hydrocodone a day because she suffered from fibromyalgia.

¶ 32    Toya acknowledged that although Butch, Andy, and Terri knew, she did not notify any other siblings when she moved Lillian from Texas to Illinois in 2009. Toya testified that Lillian had a landline in her room, but Toya had not shared the phone number with Robby, Tena, and Anette because Lillian did not want to speak to them. Toya testified to an incident where she declined Lillian's visitation with Joni, saying Lillian did not want to visit with her. Toya acknowledged that she also did not contact her siblings when Lillian was admitted to the emergency room or when she was diagnosed with sickness.

¶ 33    A spreadsheet and checks offered into evidence suggested that approximately $140,000 of Lillian's funds were unaccounted for. Toya testified that in 2008, Lillian gifted a $30,000 malpractice settlement to Toya and Toya's daughters. Toya also testified that since 2010, Lillian had pooled her monthly income for household use. Toya testified that Lillian received $3750 a month from Social Security, pension, and veterans benefits, and those funds were deposited into an account owned by Lillian and Toya, an account owned by Lillian, an account owned by Toya,

11

and an account owned by Toya's daughter, Bonnie. Reviewing bank records, Toya testified that she had no reason to disagree that from 2014 through 2016, Bonnie had received $19,000 into her account; Toya and Lillian's account had received $41,700; and Toya's account had received $33,630. Toya also testified that she signed Lillian's name on checks if Lillian could not do it.

¶ 34    Andrew John Mathis, Toya's son, testified that Toya properly cared for Lillian. Andrew testified that Toya's home was "not the most pristine plastic-on-the-couch-type environment" but was not "disgusting or inappropriate." Andrew was 37 years old and had not lived with Toya since 2009, when Lillian moved in with her.

¶ 35    Ida Maclin testified that Lillian attended holiday celebrations at her home and that Toya properly cared for Lillian.

¶ 36    Ruthie J. Moore testified that she was 81 years old and knew Lillian. Ruthie was Toya's ex-mother-in-law, had visited Lillian as recently as a month ago, and testified that Toya properly cared for Lillian. Ruthie testified that Lillian had told her that she wanted to live with Toya because she knew Toya would take good care of her.

¶ 37    Lisa Moore, Ruthie's daughter, testified that she was a registered nurse working at Memorial Hospital East in Shiloh, Illinois. Lisa testified that she visited Lillian once a week, that Lillian was happy, and that Toya properly cared for Lillian. Lisa testified that in 2011, she witnessed Lillian execute a letter wherein Lillian stated she did not want Toya to work anymore, that she wanted her to be her constant companion and care for her, and that she wanted them to live on her income.

¶ 38    Laura Gardner testified that she lived in Smithton, Illinois, and that her parents were friends with Toya. Laura testified that she considered Lillian like a grandmother. Laura testified that she had visited Lillian several times a week for five years, helping Toya with housework

when available. Laura testified that Toya cared for Lillian by properly bathing and feeding her. Laura testified that on Mondays she usually cleaned Toya's house for approximately two hours with no charge.

¶ 39 Butch testified that he had lived in Texas since 2004 and owned Gulf Coast Metal Fabricating, LLC, and Innovative Cleaning Solutions, Incorporated. Butch testified that he telephoned Lillian a couple times a week and spoke to Toya, either through text or phone call, every couple of days. Butch testified that since 2009, he had visited Lillian in Illinois two to four times per year. Butch acknowledged that in 2015, Anette contacted him regarding her difficulty with visitation with Lillian and that he did not act on her complaint. Butch testified that since 2004, he had not had much contact with Anette.

¶ 40 Butch testified that he had gifted Lillian funds since 2005, giving Lillian $500 to $1000 a month for many years. Butch initially acknowledged that Toya was handling Lillian's finances and that he had no problem with Toya and Lillian pooling their money because Lillian had persuaded Toya to quit her job to care for Lillian. Butch testified that with regard to the suggestion that an excess of $100,000 was unaccounted for, he was concerned but believed that Lillian would not have had much money remaining anyway considering the cost of Toya's care for her 24 hours a day, 7 days a week. However, at a later hearing, Butch testified that he had reflected, reviewed the financial data, and concluded that if he were named guardian of Lillian's estate, he would evaluate her finances and establish a savings account.

¶ 41 Butch testified that Toya and Lillian had a loving relationship and that Toya provided a caring environment for Lillian. Butch testified that Toya's home did not smell like marijuana, dog feces, or dog urine. Butch testified that he did not see a problem with Lillian sleeping in Toya's living room so that Toya may supervise her and so that Lillian may interact with

13

everyone. Butch testified that he would move to Illinois if necessary, in order to fulfill Lillian's wishes.

¶ 42   Butch testified that if he were named guardian of Lillian's person, he would develop a procedure that benefitted Lillian and kept communication lines open to Toya, Anette, and whoever wished to meet with her. Butch testified that he would also ensure that Toya's home remained tidy. Butch testified that he would not move Lillian from Toya's home. Butch testified that he did not believe it was important to update his siblings on Lillian's health care.

¶ 43   Butch testified that he was concerned about the appointment of Anette as guardian of Lillian's person because Anette worked outside the home and could not care for Lillian the way Toya did. In addition, Butch testified that Lillian's living area at Anette's was inappropriate because it was secluded. Further, Butch believed that Anette had a drinking problem.

¶ 44   At the hearing held on March 9, 2017, the circuit court met privately with Lillian and concluded that it was confident that Lillian needed a guardian of her person and her estate. At this hearing, the GAL reiterated the issues, including the living conditions of Toya's home, *i.e.*, the privacy and cleanliness issues; Lillian's medication issue, *i.e.*, whether Lillian was overmedicated, whether Toya was dependent on Lillian's medication, and/or whether Toya was using the medication another way; the seclusion of Lillian from her family; and Toya's financial dependence on Lillian, *i.e.*, whether Toya spent Lillian's money in ways that were not in Lillian's best interest.

¶ 45   The GAL again recommended that Anette be named guardian of Lillian's person, noting that Anette lived locally and was a nurse practitioner who was familiar with Lillian's medical issues. The GAL stated that she was confident that Anette would allow all of Lillian's family to visit Lillian and that Anette would ensure that Lillian was prescribed the proper medication. The

GAL further found Anette's home appropriate, with no similar concerns that had been raised regarding Toya's home. The GAL believed Butch was an appropriate candidate for guardian of Lillian's estate and would follow the mandates of the court so as to alleviate the past financial concerns with regard to Toya.

¶ 46 After this hearing, the circuit court entered an order finding that Lillian was an adult with a disability who needed a guardian for her person and her estate. The circuit court noted that when speaking with Lillian, she had been unable to name her children and could not recall recent events. The circuit court appointed Anette as the temporary guardian of Lillian's person and Butch as the temporary guardian of Lillian's estate. The circuit court concluded that Butch had been indifferent to legitimate concerns that Toya was not allowing Lillian to visit with her children. The circuit court also found that the living conditions at Toya's were not ideal. The circuit court noted Toya's controlling behavior and found that Toya had not made a good faith effort to comply with the court's prior order to allow Lillian to visit with her other children. The circuit court found that Lillian had been overmedicated and found it strange that the three family members with medical training and experience had been prevented from having a meaningful relationship with Lillian. The circuit court ordered that Lillian be allowed to remain with Anette for 10 days before entering its final decision.

¶ 47 At a subsequent hearing held on March 21, 2017, Anette testified that Lillian had been living with her for 12 days. Anette testified that Tena had stayed with her the first three days and Joni had stayed the following five days in order to help Lillian establish a routine. Anette testified that she had also hired a professional provider. Anette testified that Lillian's routine involved waking at 9 a.m., bathing, dressing, eating breakfast, and then watching television. Anette testified that Lillian was taken to the bathroom every two hours. Anette testified that

15

Lillian napped after lunch and that bedtime was scheduled between 8 and 9 p.m. Anette testified that Lillian had told her she did not want to leave Anette's home, that she wanted to stay, and that she did not want to return to Toya's home.

¶ 48    Anette testified that while Lillian had lived with her, Joni had taken Lillian for lunch and shopping. Anette testified that she also took Lillian for lunch. Anette testified that she purchased a phone for Lillian and provided Lillian's phone number to all of her children. Anette testified that Toya had visited Lillian 9 of the 12 days that Lillian had lived with Anette. Anette testified that Andy and Butch had also visited.

¶ 49    Anette testified that after speaking with Lillian's doctor, she had decreased Lillian's hydrocodone use to 5 milligrams, three times a day, as opposed to 10 milligrams, four times a day. Anette testified that Lillian had no withdrawal symptoms and was more alert. Anette testified that once she was awarded temporary guardianship, she had also acquired Lillian's medical records and was concerned that Lillian had suffered quite a few falls. Anette testified that Lillian had been to the emergency room at least four times as a result of falling and hitting her head.

¶ 50    Tena testified that she had stayed with Anette for three days in order to help with Lillian's routine, that she planned to retire in three months, and that she planned to drive to Anette's often to help in any way possible, including staying an entire week at a time, if necessary. Tena testified that since moving to Anette's, Lillian was more alert, outgoing, and relaxed. Tena testified that she, Anette, and Joni worked together to establish Lillian's daily routine and monitor Lillian's symptoms and medication. Tena testified that Lillian exhibited no problems adjusting to the different environment and no withdrawal symptoms once her medicine was reduced.

¶ 51    Robby testified that he had telephoned Lillian daily since Anette had been awarded temporary guardianship. Robby testified that he visited with Lillian on the day of the hearing and described her as cheerful, peaceful, and happy.

¶ 52    Toya testified that she had visited 9 out the 12 days Lillian had lived with Anette but that Anette had canceled or refused two visits. Toya testified that since living with Anette, Lillian had acted confused and wanted to live with Toya. Toya testified that Lillian's living area at Anette's home was too secluded. Toya also testified that while visiting with Lillian in Anette's home, Anette's family members had disruptively walked up and down the stairs.

¶ 53    Andy, Anette's twin and Butch's business partner, testified that he had twice accompanied Toya to visit Lillian in Anette's home. He testified that Lillian "lighten[ed] up" when Toya was nearby. He testified that at one point during a visit, Lillian put her head on Toya's shoulder and said that she wanted to go home. Andy testified that although Anette's house was beautiful, the activity occurred upstairs, and Lillian was living downstairs. Andy also testified that when he visited Lillian at Anette's home the prior Saturday, Anette looked like she had been drinking alcohol. Andy testified that he believed Toya should serve as guardian of Lillian's person and Butch should serve as guardian of Lillian's estate.

¶ 54    Butch testified that he had last visited with Lillian the day before the hearing, joining Toya and Andy to visit with Lillian in Anette's home. Butch testified that since living with Anette, Lillian had begun to use foul language more often. Butch expressed concern that Lillian was downstairs when she was accustomed to an environment with constant activity. Butch testified that Toya had engaged Lillian using memory care activities, like puzzles or yarn, and that he did not see any such activities in Anette's home. Butch testified that if he were appointed guardian of Lillian's person, he would decide where Lillian lived, possibly at Toya's or in Texas.

In answering whether he would be willing to work with Anette, Butch testified that he would do whatever was required for Lillian's best care.

¶ 55   At the end of this hearing, the circuit court found that Toya had been very dutiful and doting in caring for Lillian but had refused to allow Lillian's family members to visit her under reasonable circumstances. The circuit court further found that Toya's financial exploitation of Lillian, while acting as her caregiver, was troubling. The circuit court noted that despite the dosage decrease, Lillian had not shown withdrawal symptoms, suggesting that she possibly had not received all of her medication when living with Toya. The circuit court ordered that temporary guardianship of Lillian's person remain with Anette and temporary guardianship of her estate remain with Butch.

¶ 56   On May 12, 2017, the GAL filed a supplemental report, noting she had filed a preliminary report on February 10, 2017, and hearings were held thereafter on February 14, 2017, February 21, 2017, March 9, 2017, and March 21, 2017. The GAL noted that since the March 9, 2017, hearing, Lillian had been moved from Toya's home to Anette's home. Anette and other family members had provided care to Lillian, and a caretaker was hired to care for Lillian in Anette's home while Anette was working or otherwise unavailable. As a result of ongoing disagreement and hostility between Toya and Anette regarding Toya's visits with Lillian, the GAL recommended that Toya have a set schedule of two-hour visits three days per week with Lillian. The GAL recommended that Anette be appointed as plenary guardian of Lillian's person and Butch be appointed as plenary guardian of Lillian's estate.

¶ 57   On July 17, 2017, the circuit court appointed Anette and Tena as coguardians of Lillian's person. The circuit court appointed Butch guardian of Lillian's estate. The circuit court awarded Toya visitation with Lillian three days per week for five hours each visitation. The circuit court

18

ordered that Toya was allowed to take Lillian out of Anette's residence. The circuit court found that if Lillian's guardians and Toya could not agree on dates and times, Tena's decision shall be controlling. The circuit court issued permanent letters of office to Anette, Tena, and Butch.

¶ 58     On August 16, 2017, Butch filed a notice of appeal, appealing that part of the order denying his petition for guardianship of Lillian's person and appointing Anette and Tena as guardians of Lillian's person. On August 25, 2017, Anette filed her notice of cross-appeal, appealing the portions of the order appointing Butch as permanent guardian of Lillian's estate and granting Toya visitation.

¶ 59                                   ANALYSIS

¶ 60                         Subject-Matter Jurisdiction

¶ 61     On appeal, Butch argues that because Lillian had named Butch as agent on February 27, 2009, when she executed a valid durable power of attorney for health care pursuant to the Illinois Power of Attorney Act, the court lacked the subject-matter jurisdiction to appoint a guardian over matters covered by the agency. See 755 ILCS 45/2-10(g) (West 2016) (absent court order directing guardian to exercise powers of principal under agency, guardian will have no power, duty, or liability with respect to personal or health care matters covered by the agency). Butch argues that the circuit court failed to make required findings pursuant to the Illinois Power of Attorney Act in order to nullify his power of attorney for Lillian's health care. See *id.* § 2-10(a), (b) ((a) if court finds that principal lacks either the capacity to control or the capacity to revoke agency, court may construe power of attorney, review agent's conduct, and grant appropriate relief; (b) if court finds that agent is not acting for benefit of principal or that agent has caused or threatens substantial harm to principal's person or property, court may order guardian of estate or person to exercise powers of principal under agency). Thus, Butch argues that the circuit court's

19

order appointing Anette and Tena as coguardians of Lillian's person is void for lack of subject-matter jurisdiction.

¶ 62    "A void order or judgment is one entered by a court without jurisdiction of the subject matter or the parties, or by a court that lacks the inherent power to make or enter the order involved." *In re Estate of Steinfeld*, 158 Ill. 2d 1, 12 (1994). "A void order may be attacked, either directly or collaterally, at any time." *Id.*

¶ 63    The Illinois Supreme Court defines "subject matter jurisdiction" as a court's power " 'to hear and determine cases of the general class to which the proceeding in question belongs.' " *In re M.W.*, 232 Ill. 2d 408, 415 (2009) (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002)). "[E]xcept in the context of administrative review, an Illinois circuit court possesses subject matter jurisdiction as a matter of law over all 'justiciable matters' brought before it." *In re Luis R.*, 239 Ill. 2d 295, 301 (2010). Generally, a "justiciable matter" is "a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." *Belleville Toyota*, 199 Ill. 2d at 335; see also *Luis R.*, 239 Ill. 2d at 301. "[A] circuit court's subject matter jurisdiction is defined not by the authorizing statute but by the state constitution, and therefore the only prerequisite to the court's exercise of that jurisdiction is that the asserted claim is 'justiciable.' *Belleville Toyota*, 199 Ill. 2d at 334-35." *Luis R.*, 239 Ill. 2d at 302. "[O]nce the legislature creates a justiciable matter, the circuit court's authority to adjudicate that matter derives exclusively from the state constitution and therefore cannot be limited by the authorizing statute." *Id.* at 304.

¶ 64    Section 11a-3 of the Probate Act of 1975 (Probate Act) states, in pertinent part:

"Adjudication of disability; Power to appoint guardian.

20

(a) Upon the filing of a petition by a reputable person ***, the court may adjudge a person to be a person with a disability *** [and] may appoint *** a guardian of his person and of his estate." 755 ILCS 5/11a-3 (West 2016).

¶ 65     In this case, Anette and Butch filed petitions in the circuit court seeking an adjudication of Lillian's disability and seeking appointment of a guardian of Lillian's person and estate. The matters contained in the petition were unquestionably within the powers of the probate judge to hear and determine. See *Steinfeld*, 158 Ill. 2d at 13.

¶ 66     Butch cites *In re Hatsuye T.*, 293 Ill. App. 3d 1046, 1052 (1997), to argue that because the circuit court failed to make findings pursuant to section 2-10 of the Power of Attorney Act (755 ILCS 45/2-10 (West 2016)), the circuit court lacked subject-matter jurisdiction to enter its order for guardianship. In *Hatsuye T.*, the ward had executed a valid health care power of attorney, naming the petitioner as her authorized agent for health care decisions, but the ward specifically excluded the power to consent to electroconvulsive therapy. *Hatsuye T.*, 293 Ill. App. 3d at 1051. The trial court appointed petitioner as temporary guardian and authorized him to consent to electroconvulsive therapy treatment. *Id.* at 1047. The appellate court concluded that because the trial court had failed to make findings pursuant to section 2-10 of the Power of Attorney Act (755 ILCS 45/2-10 (West 1996)), the trial court had no authority to authorize the petitioner to consent to electroconvulsive therapy treatments for the ward in direct conflict with the ward's executed power of attorney. *Hatsuye T.*, 293 Ill. App. 3d at 1052. The appellate court concluded that the trial court's order appointing petitioner as temporary guardian and authorizing him to consent to involuntary electroconvulsive therapy was void for lack of subject-matter jurisdiction. *Id.* at 1053.

¶ 67    Notwithstanding the reasoning in *Hatsuye T.*, we reject Butch's contention that the circuit court lacked subject-matter jurisdiction to enter an order for guardianship in the present case. Instead, we agree with the court's reasoning in *In re Estate of Wilson*, 373 Ill. App. 3d 1066, 1072 (2007), that "[t]he issue concerning the authority of a circuit court to properly exercise subject matter jurisdiction has been explained in detail by our supreme court in *Belleville Toyota* *** and *** conflicts with [the] decision in *In re Hatsuye T.*, 293 Ill. App. 3d at 1053."

"Article VI of our constitution and *Belleville Toyota* are clear that, except in the area of administrative review, the jurisdiction of the circuit court flows from the constitution. Ill. Const. 1970, art. VI, § 9; *Belleville Toyota*, 199 Ill. 2d at 335 (holding that the General Assembly has no power to enact legislation that would contravene article VI)." *Id.* at 1075.

¶ 68    Here, Anette and Butch presented in their petitions to the circuit court a "justiciable matter" that was definite and concrete, not hypothetical or moot, and touched upon the legal relations of parties having adverse legal interests. We refuse to extend *Hatsuye T.* to the instant matter considering the supreme court's clarification of the scope of a circuit court's exercise of subject-matter jurisdiction in Illinois (*Belleville Toyota*, 199 Ill. 2d at 335). See *Wilson*, 373 Ill. App. 3d at 1075. Accordingly, we cannot conclude that the circuit court's order for guardianship was void for lack of subject-matter jurisdiction. See *Steinfeld*, 158 Ill. 2d at 13 (despite court's failure to follow various procedures, guardianship order was not void).

¶ 69                          Revocation of Butch's Power of Attorney

¶ 70    Butch argues in the alternative that the circuit court abused its discretion when it appointed Anette and Tena as guardians of Lillian's person and failed to appoint Butch as guardian of Lillian's person because Lillian had named him as agent under the durable power of

22

attorney for health care. Butch argues that the matters covered by Butch's power of attorney for health care included Lillian's "personal care, medical treatment, hospitalization, and health care," powers normally granted to a guardian of the person. Butch argues that because the circuit court did not explicitly find that Lillian could no longer amend or revoke her power of attorney and did not explicitly find that Butch was acting outside the terms of his agency or in a way that caused or threatened substantial harm to Lillian, as required by section 2-10(a) and (b) of the Power of Attorney Act (755 ILCS 45/2-10(a), (b) (West 2016)) in order to revoke his agency, the circuit court erred in appointing Anette and Tena as coguardians of Lillian's person.

¶ 71    The Power of Attorney Act provides that an individual, such as Lillian, "has the right to appoint an agent to make property, financial, personal, and health care decisions for the individual." *Id.* § 2-1. The Power of Attorney Act establishes that the principal may empower another person to act as an agent "throughout the principal's lifetime, including during periods of disability," and the principal must "have confidence that third parties will honor the agent's authority at all times." *Id.* Section 2-5 of the Power of Attorney Act provides, in pertinent part, as follows:

> "Unless the agency states an earlier termination date, the agency continues until the death of the principal, notwithstanding any lapse of time, the principal's disability or incapacity or appointment of a guardian for the principal after the agency is signed." *Id.* § 2-5.

¶ 72    Nevertheless, section 2-10 of the Power of Attorney Act provides that under certain circumstances the court may order a guardian to take necessary actions to protect the best interests of the principal even though the matters are covered by a power of attorney. Specifically section 2-10 of the Power of Attorney Act provides:

23

"(a) Upon petition by any interested person (including the agent), with such notice to interested persons as the court directs and a finding by the court that the principal lacks either the capacity to control or the capacity to revoke the agency, the court may construe a power of attorney, review the agent's conduct, and grant appropriate relief including compensatory damages.

(b) If the court finds that the agent is not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction has caused or threatens substantial harm to the principal's person or property in a manner not authorized or intended by the principal, the court may order a guardian of the principal's person or estate to exercise any powers of the principal under the agency, including the power to revoke the agency, or may enter such other orders without appointment of a guardian as the court deems necessary to provide for the best interests of the principal.

* * *

(g) Absent court order directing a guardian to exercise powers of the principal under the agency, a guardian will have no power, duty or liability with respect to any property subject to the agency or any personal or health care matters covered by the agency." *Id.* § 2-10(a), (b), (g).

¶ 73 Section 11a-12(c) of the Probate Act provides that if the ward is adjudged to be a person with a disability and to be totally without capacity and if the court finds that limited guardianship will not provide sufficient protection for the person with a disability, the court shall appoint a plenary guardian for the respondent's person or estate or both. 755 ILCS 5/11a-12(c) (West 2016). The selection of the guardian is in the discretion of the court, "which shall give due consideration to the preference of the person with a disability as to a guardian, as well as the

24

qualifications of the proposed guardian, in making its appointment." *Id.* § 11a-12(d). "However, the paramount concern in the selection of the guardian is the best interest and well-being of the person with a disability." *Id.*

¶ 74    Section 11a-17(a) of the Probate Act provides that "the guardian of the person shall have custody of the ward *** and shall procure for them and shall make provision for their support, care, comfort, health, education and maintenance, and professional services as are appropriate." *Id.* § 11a-17(a). However, section 11a-17(c) of the Probate Act provides that "[a]bsent [a] court order pursuant to the Illinois Power of Attorney Act directing a guardian to exercise powers of the principal under an agency that survives disability, the guardian has no power, duty, or liability with respect to any personal or health care matters covered by the agency." *Id.* § 11a-17(c).

¶ 75    In *In re Estate of Doyle*, the respondent-daughter argued on appeal that the trial court's order appointing the ward's son and son-in-law as plenary guardians was void because the ward had previously executed a power of attorney giving the respondent-daughter the exclusive authority to make decisions affecting the ward's property. *In re Estate of Doyle*, 362 Ill. App. 3d 293, 299 (2005). The appellate court found that the trial court's decision to appoint a plenary guardian "implicitly revoked" the daughter's agency pursuant to section 2-10 of the Power of Attorney Act (755 ILCS 45/2-10 (West 2004)). *Doyle*, 362 Ill. App. 3d at 299. The appellate court noted that although the ward's son and son-in-law did not file a petition under section 2-10, they did file a petition seeking guardianship over the ward, and all of the interested persons in the case had knowledge that the petitioners were asking to be guardians of the ward's person and estate. *Id.* The appellate court held that because the trial court heard evidence and determined that the ward was a disabled person as defined in the Probate Act (755 ILCS 5/11a-1 through

25

11a-23 (West 2004)) and was incapable of managing her own estate and person, the trial court had implicitly found that the ward lacked the capacity to control or revoke the power of attorney that had been given to her daughter. *Doyle*, 362 Ill. App. 3d at 300. The appellate court noted that the trial court had also held that, although the respondent-daughter with power of attorney had spent time and effort in caring for the needs of her parents, there came a time when her devotion turned to abuse and her management of the funds and property would bankrupt the estate. *Id.* Thus, the appellate court concluded that, although the trial court did not expressly reference section 2-10 of the Power of Attorney Act (755 ILCS 45/2-10 (West 2004)), the circuit court's order appointing a plenary guardian implicitly met the requirements of section 2-10 of the Power of Attorney Act, stripped the respondent-daughter of her authority as power of attorney, and gave that power to the petitioners. *Doyle*, 362 Ill. App. 3d at 301.

¶ 76      Butch cites *In re Estate of Beetler*, 2017 IL App (3d) 160248, where, two years after the ward's daughter was named plenary guardian of the ward's person and estate, the husband sought an order allowing him to arrange for dental services pursuant to his authority as the ward's power of attorney for health care. The trial court denied the husband's request, finding that its order appointing the daughter as guardian of the ward's person and estate obviated and superseded any power of attorney for health care executed by the mother. *Id.* ¶ 25. However, the appellate court reversed and remanded, concluding that "absent a written court order *explicitly* directing a plenary guardian to exercise the powers of the principal under the agency pursuant to the Power of Attorney Act, the appointment of a plenary guardian does not automatically revoke an existing power of attorney for health care." (Emphasis in original.) *Id.* ¶ 42. The appellate court noted that the circuit court's decision appointing the daughter as plenary guardian was silent and did not explicitly address the prior agency created by the ward pursuant to the Illinois

26

Power of Attorney Act (755 ILCS 45/1-1 *et seq.* (West 2016)). *Beetler*, 2017 IL App (3d) 160248, ¶ 17. Accordingly, the appellate court held that the ward's decision to designate her husband as her agent for purposes of making her health care decisions under a power of attorney survived the subsequent judicial decision appointing her daughter as plenary guardian of ward's person and estate and that letters of guardianship did not constitute a judicial order revoking the husband's status as the ward's agent pursuant to the power of attorney for health care. *Id.* ¶¶ 39-41. Thus, the court held that the decision regarding whether the ward should receive the dental procedure was clearly within the scope of the unchallenged power of attorney for health care that she executed, giving the husband the authority to make such decisions. *Id.* ¶ 42.

¶ 77　The court in *Beetler* (*id.* ¶ 38) declined to follow the rationale in *Doyle* but instead adopted the rationale expressed by the dissent in *Doyle*:

> "The whole idea of the Durable Power of Attorney Law is that the decision of a competent principal to appoint an agent should not be easily overcome. The fact that the court would not have selected the agent selected by the principal is irrelevant; what is important is what the principal thought best, not what the court thinks is best. The legislature would not have enacted the Durable Power of Attorney Law if the solution was the appointment of a guardian of the estate; guardians of the estate could be appointed before the Durable Power of Attorney Law was enacted. The suggestion that whenever a guardian of an estate is appointed any [existing] durable power of attorney is revoked is contrary to the spirit and the letter of the Durable Power of Attorney Law."
>
> *Doyle*, 362 Ill. App. 3d at 306 (Cook, P.J., dissenting).

¶ 78　We agree with the reasoning in *Beetler* that the court's order appointing a guardian of a person or estate will not implicitly revoke an existing power of attorney in every case. See 755

27

ILCS 45/2-5 (West 2016) (power of attorney agency continues notwithstanding appointment of guardian for principal after agency is signed). In *Beetler*, for example, no evidence was presented showing that the agent was not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction had caused or threatened substantial harm to the principal's person or property in a manner not authorized or intended by the principal (755 ILCS 45/2-10(a), (b) (West 2016)). Instead, the court in *Beetler* had noted that the ward's spouse and daughter remained devoted and had not been abusive towards her. *Beetler*, 2017 IL App (3d) 160248, ¶ 16.

¶ 79    However, in the case *sub judice*, as in *Doyle*, the evidence presented during the hearing on the petitions for guardianship revealed that the principal lacked either the capacity to control or the capacity to revoke the agency and that the agent was not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction had caused or threatened substantial harm to the principal's person or property in a manner not authorized or intended by the principal (755 ILCS 45/2-10(a), (b) (West 2016)). The evidence clearly showed that Lillian lacked either the capacity to control or the capacity to revoke the agency. The evidence further revealed that Butch was indifferent to Lillian's living conditions, including the lack of cleanliness in Toya's home, Toya's interference with Lillian's relationships with her children, and issues of Lillian's overmedication. Butch was also indifferent to Toya's financial exploitation of Lillian while acting as her caretaker. The evidence revealed that Butch was not acting for the benefit of Lillian and his indifference threatened substantial harm to Lillian's person or property. Thus, although the circuit court should have explicitly stated it was following section 2-10 of the Power of Attorney Act and revoking Butch's powers under the durable power of attorney for health care (*id.* § 2-10), the circuit court's findings and order

28

appointing Anette and Tena as plenary guardians of Lillian's person implicitly met the requirements of section 2-10 of the Power of Attorney Act. Pursuant to the parameters of section 2-10 of the Power of Attorney Act (*id.*), the circuit court stripped Butch of his agency under the durable power of attorney for health care and awarded Butch's powers as principal under the agency to Anette and Tena through guardianship of Lillian's person. *Id.* § 2-10(a), (b).

¶ 80                                   Guardianship

¶ 81    Butch further argues that the circuit court's refusal to follow Lillian's wishes pursuant to the durable power of attorney for health care and appoint Butch as guardian of Lillian's person constitutes an abuse of discretion. Butch argues that the circuit court erred in appointing Anette and Tena as guardians of Lillian's person. Butch argues that Lillian had made it explicitly clear that she trusted Butch to make good decisions for her and that she actively resisted the idea that her daughters should be her decision-makers. Butch further argues that Anette's work schedule does not allow her to properly care for Lillian, that Anette regularly consumed alcohol to excess, and that, in Anette's home, Lillian was tucked away in the walk-out basement. Butch further argues that moving Lillian from her living arrangement with Toya caused further deterioration in Lillian's dementia.

¶ 82    "The standard of review for the appointment of a guardian is abuse of discretion." *Doyle*, 362 Ill. App. 3d at 303. "We will not find an abuse of discretion unless the circuit court's ruling was arbitrary, fanciful, or unreasonable or unless no reasonable person would have taken the view adopted by the circuit court." *In re Estate of Kusmanoff*, 2017 IL App (5th) 160129, ¶ 94. "In determining who shall be a disabled person's guardian, the disabled person's personal preferences as to who should be his or her guardian is outweighed by what is in the disabled person's best interest." *Doyle*, 362 Ill. App. 3d at 303.

¶ 83    Section 11a-3(a) of the Probate Act (755 ILCS 5/11a-3(a) (West 2016)) provides, in relevant part, that, "[u]pon the filing of a petition by a reputable person," the court may adjudge a person to be a person with a disability and

> "may appoint (1) a guardian of his person, if it has been demonstrated by clear and convincing evidence that because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if it has been demonstrated by clear and convincing evidence that because of his disability he is unable to manage his estate or financial affairs, or (3) a guardian of his person and of his estate."

In selecting a guardian, the trial court must consider the qualifications of the proposed guardian and give due consideration to the preference of the person with the disability, but the court is not bound by that preference. *Id.* § 11a-12(d); *In re Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 141. Rather, "the paramount concern in the selection of the guardian is the best interest and well-being" of the person with a disability. 755 ILCS 5/11a-12(d) (West 2016). Factors that the trial court may consider in making that determination include:

> "(1) the degree of relationship between the disabled person and the proposed guardian; (2) the recommendations of persons with kinship or familial ties to the disabled person; (3) conduct by the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian; (4) prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person; (5) the ability of the proposed guardian to manage the disabled person's estate (the proposed guardian's business experience and other factors); and (6) the extent to which the proposed guardian is committed to discharging any responsibilities which might conflict with his or her

30

duties as a guardian." *McHenry*, 2016 IL App (3d) 140913, ¶ 141 (citing *In re Estate of Johnson*, 303 Ill. App. 3d 696, 705 (1999)).

¶ 84    The foregoing circumstances were relevant to the circuit court's determination regarding Butch's ability to make personal decisions in Lillian's best interest, and we will not substitute our judgment for that of the circuit court regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. See *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). The circuit court heard numerous witnesses testify in this case. Some witnesses testified that they believed Toya was confiscating Lillian's prescribed medicine, financially exploiting Lillian, using marijuana in Lillian's presence, providing an unclean and unsafe home environment for Lillian, and refusing reasonable visitation requests by Lillian's other children. Other witnesses testified that Toya and Lillian had a wonderful relationship and that Toya properly cared for Lillian.

¶ 85    Although Butch testified that he would work out a visitation plan to include visits for all of Lillian's children and keep Lillian's well-being as his primary concern, Butch essentially conceded that he had not done so previously. Butch had knowingly acquiesced in Toya's commingling of Lillian's funds and her restriction of visits between Lillian and her children. On the other hand, the evidence revealed that Anette and Tena were Lillian's daughters, had experience in the health field, and could provide a safe and nurturing environment for Lillian. Based on the witnesses' testimony and the reports of the GAL, the court determined that it was in Lillian's best interest for Anette and Tena to act as guardians of her person. We do not find the circuit court abused its discretion in making this determination.

¶ 86    On cross-appeal, Anette argues that the circuit court abused its discretion in appointing Butch as guardian of Lillian's estate. Anette argues that, although Butch owns businesses, he

31

admitted in court that he paid Toya $1000 per month from one of his business accounts and, therefore, he showed a lack of good business judgment by commingling his company business funds with his personal business. Anette argues that Butch also testified that he acquiesced in Toya's commingling of Lillian's income with her own. Anette argues that she should have been appointed guardian of Lillian's estate so that she may purchase necessities for Lillian's care, with Lillian's funds, without the need to acquire a court order to purchase necessities.

¶ 87   Butch testified to his business experience and to gifting Lillian $500 to $1000 a month since 2005. Butch testified that after reviewing Lillian's financial data, if he were named guardian of Lillian's estate, he would evaluate her finances and establish a savings account. In answering whether he would be willing to work with Anette, Butch testified that he would do whatever was required for the best care of Lillian. Both Toya and Andy recommended Butch as guardian of Lillian's estate, with Robby conceding that Butch was capable of handling Lillian's finances. Again, the circuit court heard numerous witnesses testify, and we will not substitute our judgment for that of the circuit court regarding the inferences to be drawn therefrom. Based on the witnesses' testimony and the reports of the GAL, the circuit court determined that it was in Lillian's best interest for Butch to act as guardian of her estate. We do not find that the circuit court abused its discretion in making this determination.

¶ 88                              Visitation

¶ 89   Anette further argues that the circuit court abused its discretion when it granted Toya visitation three days per week for five hours per day.

¶ 90   The provisions of the Probate Act cannot be so arbitrary as to empower a plenary guardian to make decisions with respect to the multitude of innately personal decisions which may be made by guardians on behalf of their wards except for the decision to manage visitation.

32

Either the guardian can act in the best interests of the ward for all personal matters, or for none at all. See *Karbin v. Karbin*, 2012 IL 112815, ¶ 49.

¶ 91    Effective January 1, 2017, section 11a-17(g)(2) of the Probate Act provides as follows:

"If a guardian unreasonably prevents an adult child of the ward from visiting the ward, the court, upon a verified petition by an adult child, may order the guardian to permit visitation between the ward and the adult child if the court finds that the visitation is in the ward's best interests. In making its determination, the court shall consider the standards set forth in subsection (e) of this Section. This subsection (g) does not apply to duly appointed public guardians or the Office of State Guardian." 755 ILCS 5/11a-17(g)(2) (West 2016).

¶ 92    Subsection (e) provides:

"(e) Decisions made by a guardian on behalf of a ward shall be made in accordance with the following standards for decision making. Decisions made by a guardian on behalf of a ward may be made by conforming as closely as possible to what the ward, if competent, would have done or intended under the circumstances, taking into account evidence that includes, but is not limited to, the ward's personal, philosophical, religious and moral beliefs, and ethical values relative to the decision to be made by the guardian. Where possible, the guardian shall determine how the ward would have made a decision based on the ward's previously expressed preferences, and make decisions in accordance with the preferences of the ward. If the ward's wishes are unknown and remain unknown after reasonable efforts to discern them, the decision shall be made on the basis of the ward's best interests as determined by the guardian. In determining the ward's best interests, the guardian shall weigh the reason for and nature of the proposed

33

action, the benefit or necessity of the action, the possible risks and other consequences of the proposed action, and any available alternatives and their risks, consequences and benefits, and shall take into account any other information, including the views of family and friends, that the guardian believes the ward would have considered if able to act for herself or himself." *Id.* § 11a-17(e).

¶ 93 Prior to section 11a-17(g)(2)'s effective date, the appellate court had held that "Article XIa [of the Probate Act] does not contain any provision providing that relatives can request visitation with the ward or challenge the guardian's individual decisions regarding visitation or other matters concerning the ward." *Struck v. Cook County Public Guardian*, 387 Ill. App. 3d 867, 877 (2008); see also *Warga v. Warga*, 2015 IL App (1st) 151182, ¶ 20; *cf. In re Guardianship of Huseman*, 358 Ill. App. 3d 299, 306 (2005) (although it had no basis in statute, order involving dual custody, medical coverage, and visitation of disabled adult determined valid because the parties agreed to the order in question, and it was therefore a consent decree).

¶ 94 In this case, although section 11a-17(g) was in effect when the circuit court entered its order for visitation, no verified petition had been filed and no evidence suggested that Anette or Tena had unreasonably prevented Toya from visiting Lillian. Thus, we find that the circuit court's order requiring visitation was premature. Accordingly, we reverse that portion of the circuit court's order providing for Toya's visitation with Lillian for five hours, three times a week.

¶ 95 In this regard, we note that pursuant to section 11a-17, a guardian's actions are always subject to the supervision of the circuit court. 755 ILCS 5/11a-17(a) (West 2016); *Karbin*, 2012 IL 112815, ¶ 52. Indeed, a " 'guardian only acts as the hand of the court and is at all times subject to the court's direction in the manner in which the guardian provides for the care and

34

support of the disabled person.' *In re Wellman*, 174 Ill. 2d [335,] 347 [(1996)]." *Karbin*, 2012 IL 112815, ¶ 52 (plenary guardian does not lack standing to institute dissolution of marriage proceedings on behalf of the ward but must seek permission from the court to file a dissolution petition on behalf of the ward). Accordingly, if Anette or Tena unreasonably prevents Lillian's children from visiting her in the future, any sibling may file a verified petition pursuant to section 11a-17(g)(2), and upon a best-interests finding, the circuit court may ultimately order visitation. At this stage of the proceedings, however, we find the circuit court's visitation order premature and reverse it.

¶ 96                                    CONCLUSION

¶ 97    For the reasons stated, we affirm in part and reverse in part the judgment of the circuit court of St. Clair County.


¶ 98    Affirmed in part and reversed in part.

2018 IL App (5th) 170317

NO. 5-17-0317

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* GUARDIANSHIP OF LILLIAN BURDGE, a Disabled Adult | ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| (Michelle Anette Hagarty, Petitioner-Appellee and Cross-Appellant; Adelbert Burdge III, Counterpetitioner-Appellant and Cross-Appellee; Tena Payne, Appellee; and Toya Egbert, Cross-Appellee). | ) ) ) ) ) ) ) ) | No. 16-P-136 |
| | ) ) ) | Honorable Stephen P. McGlynn, Judge, presiding. |

_____

**Opinion Filed:**          **November 16, 2018**
_____

| | |
|---|---|
| **Justices:** | Honorable David K. Overstreet, J. |
| | Honorable John B. Barberis, P.J., and Honorable Richard P. Goldenhersh, J., Concur |

_____

| | |
|---|---|
| **Attorney for Appellant** | Jason P. Kleindorfer, 115 West Washington Street, P.O. Box 546, Belleville, IL 62222 |

_____

| | |
|---|---|
| **Attorney for Appellees** | Sandra J. Tatoian, Mathis, Marifian & Richter, Ltd., Mark Twain Plaza 1, 101 West Vandalia Street, Suite 100, P.O. Box 247, Edwardsville, IL 62025 |

_____