2020 IL App (2d) 191038-U
No. 2-19-1038
Order filed December 15, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re ESTATE OF BRIAN T. BRANICK, an Alleged Disabled Adult | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| | | No. 19-P-328 |
| (Lissette Branick, Petitioner and Counter-respondent-Appellee, v. Thomas Branick, Respondent and Counterpetitioner-Appellant). | | Honorable Joseph V. Salvi, Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

## ORDER

¶ 1    *Held*: The trial court applied the proper standard in resolving the guardianship dispute and did not abuse its discretion in appointing the mother as plenary guardian of the estate and person of the parties' adult disabled son or in setting a visitation schedule.

¶ 2    The parties, Lissette Branick and Thomas Branick, filed competing petitions for plenary guardianship of their adult disabled son, Brian Branick, pursuant to the Illinois Probate Act (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2018)). Following a bench trial, the trial court granted Lisette's petition and named her the sole plenary guardian of Brian's person and estate. The trial court subsequently entered an order setting forth additional terms of the guardianship. Thomas appeals from both orders. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Thomas and Lisette were married in 1995. They had two children: a daughter, born in 1999, and Brian, born in 2001. In 2004, when Brian was approximately three-and-a-half-years old, he was diagnosed with autism spectrum disorder. Thomas and Lissette later separated, and a judgment for dissolution of marriage was entered in July 2009. The dissolution judgment named Lisette as the primary residential custodian of the children, established Thomas's child support obligations, and incorporated the terms of a joint parenting agreement that included Thomas's parenting time schedule.

¶ 5      Thomas has been a police officer for over 25 years. In September 2009, during Thomas's parenting time, Brian took Thomas's loaded service weapon off the kitchen counter and shot himself in the head. Brian was eight years old at the time. Brian sustained traumatic brain injury and was hospitalized for over a month. In 2010, Lisette and the children temporarily relocated to North Carolina and lived near Lissette's extended family. They returned to Illinois in 2011 and rented a townhome in Buffalo Grove, where, at the time of trial, Lissette, Brian, and Lissette's mother continued to reside. Lissette became employed as a special needs teacher's aide and enrolled in a master's degree program in special education. In 2013, Thomas filed a petition for change of custody and sought primary residential custody of the children. The trial court denied the petition, and primary residential custody of the children remained with Lissette.

¶ 6      On April 5, 2019, shortly before Brian turned 18 years old, Lissette filed a petition to be appointed plenary guardian of Brian's person and estate. Lissette attached to her petition a report from Dr. David Dobkin, Brian's pediatrician of 15 years, which stated that guardianship was needed for Brian and that "Brian currently resides at home and is cared for by his mother who is

doing an excellent job of providing for all of his needs." On April 17, 2019, Thomas filed a counterpetition to be appointed plenary guardian.

¶ 7                          A. Guardian *Ad Litem*'s Reports

¶ 8     The trial court appointed attorney Rosemary Alexander to serve as Brian's guardian *ad litem*. During the course of the guardianship proceedings, the guardian *ad litem* filed three reports. In her May 16, 2019, interim report, the guardian *ad litem* stated that Brian attended Stevenson High School (Stevenson) and was scheduled to graduate in spring 2019. She explained that throughout his attendance at Stevenson, Brian had an individualized education plan (IEP) and "a team of specialists that service Brian and attend his IEP meetings including an occupational therapist, social worker, case manager, psychologist[,] and others." She further explained that Brian is "eligible to attend Stevenson's District 125 Transition Program upon graduation from high school for the next four years where his IEP will follow him." The campus for the Transition Program is adjacent to the high school and provides individualized skill development for special education students from ages 18 to 22. The goal of the Transition Program is to "increase the students' independence through vocation, social[,] and life skill development."

¶ 9     The guardian *ad litem* further advised in her interim report as to her respective meetings with the parties and Brian as well as her review of communications between Thomas and Lissette. Brian was unable to communicate a preference as to his guardian. The guardian *ad litem* reported that "Tom is very focused on Brian's needs and the services and benefits that he may qualify for, and what is required to place Brian in line for same." She referred to an April 3, 2017, email from Thomas to Lissette in which Thomas "noted that he found out that Lissette kept Brian home from school for Summer 2016" despite the IEP team's recommendation that Brian attend summer school. Moreover, the guardian *ad litem* reported, Thomas asked Lissette about "efforts to get

Brian on the PUNS[1] list as discussed and recommended in Brian's last two IEP meetings" and sent follow-up emails about the issue. Specifically, on January 17, 2019, Thomas sent Lissette an email outlining the following: "He wanted joint legal guardianship[;] [h]e was still inquiring about the PUNS list and status as he had been for the past 2 years[;] [h]e had no information on Brian's social security benefits[; and] [h]e asked if Brian had a Disabled Illinois ID card." However, to the guardian *ad litem*'s knowledge, Lissette had not responded except "for [an] illness update explaining her delay." The guardian *ad litem* summarized: "Lissette's production of written communications between the parties lacked any recent substantive inquiries to Tom pertaining to planning for Brian in the Transitions program and beyond, any disclosure of her receiving Social Security Benefits and no recent substantive responses to the many pending and critical issues set forth in Tom's email to Lissette dated January 17, 2019."

¶ 10     In her June 18, 2019, final report, the guardian *ad litem* stated that "co-guardianship is not practicable nor in Brian's best interests," that "legal guardianship of Brian would hand Lissette the absolute legal mechanism to keep Thomas involved in Brian's life on her terms," and that it "is in Brian's best interests that his father [Thomas] be appointed plenary guardian of [Brian's] person and estate." The guardian *ad litem* explained the basis for her recommendation:

---

[1] As reported by the guardian *ad litem*: "PUNS is a statewide database that records information about individuals who have developmental disabilities and who are potentially in need of services. The services that PUNS provides may include residential living arrangements, training programs for work and life skills, adaptive equipment[,] and in-home support to assist with independent living."

"As noted in summary fashion in the report, the written communications between the parties demonstrated Tom requesting information from Lissette, Tom requesting status or follow-up responses on previous requests made to Lissette when none were forthcoming, and Tom asking for paperwork/information for events/deadlines that already had occurred and for which he had no notice. Lissette would either provide no substantive response to Tom's inquiries or provide a reason that her response would be delayed."

¶ 11    The guardian *ad litem* further explained that "[u]nfortunately, the in-person dynamic of communication mirrored the written." Namely: "Lissette could not provide any concrete conclusive responses to even dispose of one issue presented for discussion. Her commentary and responses (when she did not demur to her counsel) were deflective and/or set an inherent path of delay." Moreover, the guardian *ad litem* reported: "Lissette continues to edit and control the flow of relevant information relating to Brian from Thomas. *** This penchant to control the flow of information that will likely follow Brian's placement now during Transitions and in the future is indicative of an unwillingness to share information which might result in the parents being required to negotiate different viewpoints." Further, "Lissette's admission that she would willingly move Brian to a state where Thomas did not reside, her unwillingness to share important information about Brian with Thomas and making school related decisions without [Thomas's] input and not disclosing them until they were discovered by [Thomas] signal her view of Thomas'[s] relative unimportance in Brian's continued well-being."

¶ 12    On September 23, 2019, the guardian *ad litem* filed a supplement to her final report, as "the scope of [her] investigation was necessarily widened" following the parties' unsuccessful settlement conference. The guardian *ad litem* reviewed the parties' discovery responses; reviewed subpoenaed documents from the PUNS list agency contact; attended the deposition of Brian's

pediatrician; and contacted two members of Brian's IEP team at Stevenson—school psychologist Andrew Schroeder and case manager and primary teacher Tamara Napolitano.

¶ 13    With respect to her telephone interview with Andrew Schroeder, the guardian *ad litem* reported:

> "Mr. Schroeder recalled that Lissette fought the IEP team that wanted to include Intellectual Disability in Brian's IEP and also fought the IEP team that did not feel that TBI [traumatic brain injury] should be part of Brian's IEP. There was a feeling amongst the team members that Lissette felt she possessed equal/superior knowledge and qualifications to make these determinations in opposition of Brian's entire IEP team. Notably, Mr. Schroeder commented that it was clear that Lissette was mad at Thomas and viewed him negatively as she routinely blamed Thomas whenever Brian was having difficulty or a bad day ***."

¶ 14    The guardian *ad litem* addressed Lissette's position that her education in the field of special education and her role as the custodial parent make her the preferred choice for Brian's plenary guardian. The guardian *ad litem* stated that her position "ignores the fact that Brian is now a disabled adult and his ongoing needs on a going forward basis are not the same and will not be the same as they have been the past 18 years." Rather:

> "The analysis here of choosing which parent will meet Brian's needs and serve his best interests as a disabled adult is far more complex than a review of historical custodial care provided to date and a determination of who was the primary contact with Brian's medical providers as the issues presented and that will be presented to Brian's parents as the parents of a disabled adult are ones that have not yet been encountered including, but not limited to, Brian's vocational training for possible future employment, Third party

and/or First Party Trust issues, and future living arrangements, long term placement and care issues."

¶ 15    Thus, the guardian *ad litem* concluded, "[w]hile Lissette's exceptional care of Brian to date before the parties filed for plenary guardianship is to be commended, Lissette's 'rear view mirror' assessment of her care of a minor child to date should not be the end of the inquiry as to which parent will best serve Brian's best interests as plenary guardian." The guardian *ad litem* maintained her recommendation that it was in Brian's best interests that Thomas be appointed the plenary guardian of Brian's person and estate for the reasons stated in the report, "most notably Thomas'[s] commitment to keep Lissette involved in Brian's life and ongoing concern about Lissette's lack of commitment to do the same."

¶ 16                                B. Trial

¶ 17    A bench trial on the parties' petitions for plenary guardianship commenced on October 2, 2019. The parties stipulated that Brian has a developmental disability as defined by statute and is not able to manage his person and estate because of his developmental disability. Both Thomas and Lissette testified at trial as well as Thomas's wife, family members and colleagues of Lissette, Brian's pediatrician, the guardian *ad litem*, and members of Brian's IEP team.

¶ 18    Thomas testified that he is employed as a police officer with the Gurnee Police Department. In 2015, he married April Branick. They live in a house in Gurnee and do not have children together. Thomas testified regarding his active involvement in Brian's educational needs, his attendance at all of Brian's IEP meetings at Stevenson, and what he described as his persistent prodding of Lissette to take the necessary steps to obtain resources for Brian, such as placement on the PUNS list. Thomas further testified regarding instances where Lissette withheld information and ignored his communications regarding Brian. For instance, Thomas did not learn until

discovery in this proceeding that Brian was receiving supplemental security income despite his past request to discuss the issue with Lissette. Thomas testified that the withholding of this information impeded the effectiveness of the special needs trust that Thomas had established to maximize Brian's eligibility for financial assistance.

¶ 19    Thomas was instrumental in finding and negotiating the lease for Lissette's townhome when she returned from North Carolina in 2011. He paid for her moving expenses, and over the years, he provided financial assistance in excess of his court-ordered obligations. Thomas testified that Lissette denied his requests for additional parenting time.

¶ 20    Thomas testified that if he were appointed plenary guardian, he anticipated that Brian would continue to reside with Lissette for the remainder of his four years in Stevenson's Transition Program. If Lissette refused, Thomas's secondary plan was that Brian would live with him and attend an equivalent transitional program in a school district in Gurnee.

¶ 21    Thomas testified that he was considering a move to North Carolina after he retired in approximately four years. His wife was from North Carolina and purchased a beach house there. Moreover, Lissette had family in North Carolina and previously lived there. Thomas had researched opportunities for Brian upon completion of a transitional program. He determined that a community integrated living arrangement (CILA) would best serve Brian's interest as a disabled adult and that CILAs were available in both Illinois and North Carolina. Thomas testified that his potential post-retirement plans included starting his own CILA or an entrepreneurial business, such as a dog daycare or coffee shop, to provide Brian opportunities to participate and hone life skills. Thomas testified that if he moved to North Carolina with Brian, he would facilitate visitation for Lissette and share in the travel expenses. Thomas's wife, April, testified that she had a trusting and

loving relationship with Brian and that she supported Thomas's plan to open a CILA in either Illinois or North Carolina where Brian could reside when ready.

¶ 22 Thomas testified that his parenting of Brian had influenced his approach to law enforcement. He earned several professional certifications in effective crisis intervention for individuals suffering from mental health and intellectual disabilities. He also trains law enforcement officers on effective police interaction with autistic individuals. Thomas testified that in 2012, he responded to a dispatch call related to a "female screaming about a missing child." The child was Brian. Thomas found Brian alone, throwing rocks on the edge of a pond on a golf course near Lissette's townhome. Lissette never spoke to Thomas about the incident.

¶ 23 Lissette testified regarding her care of Brian. She explained that Brian has limited speech and communication and "needed help throughout his life dressing, brushing, cooking for him, going—driving him to places, such as doctors' appointments, caring for his basic needs." She stated that she was the primary contact with Brian's pediatrician and accompanied Brian to "95 percent" of his primary care appointments.

¶ 24 Brian was not able to drive or take public transportation; he also needed assistance with leaving school and arriving home on the school bus. When he reached high school, Lissette testified, Brian still "needed help on having his breakfast done" and "needed help and prompting to pick out his clothes, to get dressed." Lissette testified regarding her use of special education tools such as instruction and communication boards and a "TouchChat" device to communicate with Brian. She stated that "[w]hen you raise a child who has a disability, you face challenges in trying to see what they want when they can't communicate and use their words to communicate."

¶ 25 Lissette testified that Brian graduated from Stevenson in 2019 and continued in the Transitions Program there. He is eligible to remain in Stevenson's Transitions Program through

age 22. However, at the time of trial, the townhome Lissette rented was for sale, although she was attempting to negotiate the purchase of the townhome and also looking for a new home in the same school district. Lissette acknowledged that she has required financial assistance from friends and relatives to pay expenses. Regarding what Brian will do after the Transitions Program, Lissette testified that she did not know and "would have to see what skills he gains." Lissette testified that she registered Brian for the PUNS list and that she consulted with counsel regarding potential plans to establish her own special needs trust for Brian.

¶ 26    Lissette's mother, Maria Rivas, testified that she moved in with Lissette and Brian in approximately 2012. Maria is not employed; she accompanies Brian to and from the school bus each day and attends to Brian when Lissette is at work or school. Maria's primary language is Spanish, but she testified that the language barrier is not an impediment to her communication with Brian, as "he is [her] life and [she] enjoy[s] being with him." Maria testified that she planned to continue to live with Lissette and Brian "until God takes [her] life away."

¶ 27    The evidence demonstrated that Lissette and Brian participated in family gatherings, travel and celebrations, volunteer opportunities, the high school ministry, and church services. Lissette also registered Brian for extracurricular activities, including "buddy baseball" and the "Best Buddies" program for children with special needs. Karla Anderson, Lissette's cousin and a clinical psychologist, testified that she visited Lissette and Brian approximately three times per year. Karla described Lisette as "just a great mom" to Brian—very loving, affectionate, caring, attentive, and playful.

¶ 28    Evidence regarding Lissette's work as special needs teacher's aide was introduced into evidence. Lissette testified that her job responsibilities included "working and giving [special needs students] support with their work skills, going into the environment, working with them,

making sure that we take data and see what skills they are still needing to work upon so that after they leave transition, they can become independent young adults." Lissette's performance reviews from her colleagues and superiors collectively described Lissette as respectful and responsive to students and a valued member of the classroom team.

¶ 29 The former principal of the school where Lissette was employed, Kimberly Dungan, testified and elaborated that Lissette was "very patient with students," adhered to "protocols and programs," and was "very knowledgeable about special education, especially with our students with autism." Namely, Lissette "dealt with significant behaviors and aggressive behaviors in a very calm, systematic fashion and, again, following behavior plans." In sum, principal Dungan testified, Lissette was "reliable and dependable" and showed "a lot of passion for her work and a lot of care for the students." Moreover, Jamie Cullen, the mother of one of Lissette's students, testified that she specifically requested Lissette's assistance with her autistic son. She also described Lissette as an "amazing mother" and explained that Lisette exposed Brian to many different environments, encouraged his independence, and exhibited patience, understanding, and an ability to anticipate Brian's needs.

¶ 30 Lissette testified that she had suspended her studies in the master's degree program during the course of the guardianship dispute. However, she was "very close to finishing," with one exam and two classes remaining to obtain her degree. As of June 2019, her cumulative grade point average was a 3.93 out of a 4.00.

¶ 31 Brian's pediatrician Dr. Dobkin testified regarding Brian's autism diagnosis and explained: "Brian would be more in the middle to lower functioning ****. He does not have *** [the ability] to communicate properly to—to medical personnel, teachers, other—other people. So that was his main manifestation of autism was the communication aspect as well as cognitive delays associated

with autism spectrum." Dr. Dobkin also testified that he has treated between 80 and 100 children with autism or other special needs and that he had a "gestalt" feeling about Lissette. He explained that "any recommendations we made to [Lissette] and Brian, be it medication, be it therapy, be it tests *** she was always willing to do." He testified that he had no reservations about Lisette acting as Brian's plenary guardian. Regarding whether he had reservations about Thomas acting as Brian's plenary guardian, Dr. Dobkin stated: "I don't feel I can answer. I don't have enough information. I don't have any—met Thomas not a handful of times so I can't make that—can't answer that question." Dr. Dobkin further testified that navigating change was harder for a person with autism and explained the importance of structure and routine to an autistic person.

¶ 32    Dr. Dobkin acknowledged that he signed the report that Lissette submitted in support of her petition for plenary guardianship but did not personally prepare the report. The report included the statement that "[w]ithout the care and support of his Mother, Lissette, Brian would require an assisted living arrangement with a full[-]time caregiver." In this testimony, Dr. Dobkin corrected the statement as follows: "He needs to be in the care—my—recommendation that he requires supervision from a loving parent. Otherwise, he would need to be in [*sic*] a full-time caregiver."

¶ 33    The guardian *ad litem* testified regarding her investigation in this case and her recommendation that Thomas be appointed plenary guardian. She concluded that both parties were active in Brian's education and support. They both participated in Brian's IEP meetings. However, the guardian *ad litem* testified, "[Thomas] was more willing to listen to the directives of the professionals" while Lissette challenged professional recommendation and "delayed the process of certain issues." The guardian *ad litem* also testified regarding Thomas's report of many instances of Lissette's failure to share information regarding Brian.

¶ 34    The guardian *ad litem* opined that the past custody arrangement was not determinative in her recommendation because Brian's needs as a disabled adult are different from his childhood needs. She testified that Thomas had very specific ideas and plans for Brian's future while Lissette's were "without specificity" and "always under research." Both parties discussed with the guardian *ad litem* their separately contemplated out-of-state relocations. Thomas desired to move to North Carolina after he retired in approximately four years. His wife was from North Carolina and owned a home there; moreover, Lissette had family in North Carolina and previously lived there. Lissette was researching other states in which to reside and stated that Thomas's location was not a factor in evaluating the decision. Lissette stated that Brian loved to travel and could fly on an airplane to visit Thomas and that Thomas could travel to see Brian. The guardian *ad litem* testified that, based upon her investigation, Thomas understood that Brian "needs both of his parents in his life" and thought that Thomas would "do everything, if he is appointed, that he could do to make that happen." However, when questioned whether she thought Lissette would facilitate a relationship between Thomas and Brian if Lissette were appointed, the guardian *ad litem* responded that she "[could not] say with any assuredness that that would happen." The guardian *ad litem* testified that her interim report omitted a recommendation because Thomas wanted to attempt to reach an agreement on co-guardianship. According to the guardian *ad litem*, Lissette was unresponsive to attempts to reach agreement on co-guardianship. However, the guardian *ad litem* acknowledged that Lissette's counsel had contacted her regarding the issue and that this contact led to a settlement conference about potential co-guardianship.

¶ 35    School psychologist Andrew Schroeder testified that both Lissette and Thomas attended all of Brian's IEP meetings, were active participants in the meetings, and provided input and recommendations for Brian at the meetings. He denied having made the negative statements

regarding Lissette's interactions with the IEP team attributed to him by the guardian *ad litem* in her supplemental report. Rather, he testified, Lissette "would ask questions, would ask for time to think things over" and, depending upon the meeting, Lissette responded in "a few days" or "maybe weeks would go by and eventually she would agree with the team's goals." He could not recall "a dispute that wasn't resolved fairly quickly." Schroeder further explained that the guardian *ad litem* did not ask open-ended questions but instead questions that asked him to agree or disagree with certain propositions formulated by the guardian *ad litem*.

¶ 36    The evidence deposition of Brian's teacher and IEP case manager, Tamara Napolitano, was admitted into evidence. She testified that she used an independent functioning skills curriculum to promote Brian's employability, hygiene, self-care, and transportation use. She also encouraged Brian to be less dependent on technology for communication. Napolitano discussed the experience and credentials of Brian's IEP team. She testified that there were instances when Lissette questioned the IEP team's goal or strategy for Brian and while not argumentative, "did question, you know, our area of expertise." She also testified that she spoke to the guardian *ad litem* at a point when the guardian *ad litem*'s report was almost complete (because it had been summer break when the guardian *ad litem* contacted her) and confirmed her agreement or disagreement with information in the report.

¶ 37    The parties filed written closing arguments, setting forth their respective positions in support of appointment as Brian's plenary guardian.

¶ 38                              C. Trial Court's Ruling

¶ 39    On October 28, 2019, the trial court entered an order, appointing Lissette as plenary guardian of Brian's person and estate. The order specified that the duration and term of plenary guardianship was until further court order and that the appointment was without authorization to

make residential placement or remove Brian from Illinois permanently without court approval. The trial court reviewed at length the testimony of the witnesses and the guardian *ad litem*'s reports. As a threshold matter, the trial court found both parties qualified under the Probate Act to serve as plenary guardian. See 755 ILCS 5/11a-5(a)(1)-(a)(5) (West 2018). However, the trial court noted the acknowledgement by the parties and the guardian *ad litem* "that there are issues of communication and dialogue between the parties that make co-guardianship difficult."

¶ 40   The trial court articulated the standard for selection of a guardian as set forth in the Probate Act (see 755 ILCS 5/11a-12(d) (West 2018)) and delineated the factors to consider in determining whether the selection of the guardian is in the best interest and well-being of the person with a disability (see *In re Estate of McHenry*, 2016 IL App (3d) 140913). In this regard, the trial court initially noted that Brian was unable to communicate his preference as to a guardian.

¶ 41   In addressing the guardian *ad litem*'s recommendation that Thomas be appointed guardian, the trial court found that the guardian *ad litem* "focuse[d] much of her attention in her reports and her testimony on the communications and interaction between Thomas and Lissette." The guardian *ad litem* opined, based upon her review of the parties' communications, interviews, and personal observations, "that Thomas would be more likely to facilitate information from one parent to the other and foster a continuing relationship between Brian and the non-guardian parent." However, the trial court found, the guardian *ad litem* "[did] not focus on how change would affect Brian." Moreover, the trial court found, the guardian *ad litem* "fail[ed] to state the positive relevant information regarding Lissette's school and work performance."

¶ 42   In appointing Lissette to be Brian's guardian, the trial court reasoned:

"Lissette, Thomas[,] and Dr. Dobkin agree that routine, consistency[,] and stability are important to Brian. [] Brian has primarily resided with Lissette his entire life. Thomas

on cross-examination agreed that during the time Brian has primarily resided with Lissette, Brian received appropriate medical care, dental care, good education[,] and had a good upbringing \*\*\*. The evidence was uncontradicted that Lissette was primarily responsible for the medical and dental appointments and that Lissette was the primary residential parent of Brian since the divorce. The Court finds that both parties were involved in the educational upbringing of Brian. The evidence is uncontradicted and specifically Dr. Dobkin testified that change is difficult for individuals who have [autism spectrum disorder]."

¶ 43    The trial court concluded: "Lissette had committed her whole life to [the] raising of Brian. Her personal and work life center around Brian and his condition and needs. Thomas and Lissette have done an admirable job with Brian and any further change or disruption would be difficult for Brian and unnecessary for his care, and therefore, not in his best interest."

¶ 44    The trial court continued the proceeding for the parties to present "a parenting time schedule and notification/communication order." The trial court subsequently directed the parties to submit their respective proposals on these issues.

¶ 45    Following the parties' submissions, on November 22, 2019, the trial court entered an order setting forth additional terms regarding communication, notice, and visitation. The order, *inter alia*: (1) provides Thomas a parenting time schedule and specifies notice requirements regarding schedule revisions; (2) prohibits Lissette from moving Brian more than 25 miles from their current residence absent a court order or the parties' agreement; (3) requires Lissette to provide at least 14 days' advance notice to Thomas of any appointments or meetings regarding Brian's needs, resources, or benefits; (4) requires the parties to update each other if they bring Brian to the doctor (other than for a routine appointment) within four hours of the appointment; (5) authorizes both

parties to attend all IEP meetings, school conferences and activities, and any appointments related to Brian's needs, resources, or benefits, and provides that both parties shall be copied on all correspondence regarding Brian's education, medical well-being, or disability benefits; and (6) authorizes Thomas to communicate and receive all information from Brian's educators, medical professionals, and disability resource professionals.

¶ 46    Thomas timely appealed from both the October 28, 2019, and November 22, 2019, orders.

¶ 47                                II. ANALYSIS

¶ 48    Thomas challenges the appointment of Lissette as the sole plenary guardian of Brian's person and estate. He also challenges the visitation schedule set forth in the trial court's subsequent order. We address each argument in turn.

¶ 49                            A. Appointment Order

¶ 50    The selection of a guardian for a disabled person "shall be in the discretion of the court, which shall give due consideration to the preference of the person with a disability as to a guardian, as well as the qualifications of the proposed guardian, in making its appointment." 755 ILCS 5/11a-12(d) (West 2018). However, the "paramount concern in the selection of the guardian is the best interest and well-being of the person with a disability." 755 ILCS 5/11a-12(d) (West 2018); *McHenry*, 2016 IL App (3d) 140913, ¶ 141. Factors that the trial court may consider in making that determination include: "(1) the degree of relationship between the disabled person and the proposed guardian; (2) the recommendations of persons with kinship or familial ties to the disabled person; (3) conduct by the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian; (4) prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person; (5) the ability of the proposed guardian to manage the disabled person's estate (the proposed guardian's business experience and other

factors); and (6) the extent to which the proposed guardian is committed to discharging any responsibilities which might conflict with his or her duties as a guardian." *McHenry*, 2016 IL App (3d) 140913, ¶ 141 (citing *In re Estate of Johnson*, 303 Ill. App. 3d 696, 705 (1999); *In re Schmidt*, 298 Ill. App. 3d 682, 690 (1998)).

¶ 51     The trial court's decision regarding the appointment of a guardian for a disabled adult is subject to an abuse of discretion standard of review on appeal. *In re Guardianship of Burdge*, 2018 IL App (5th) 170317, ¶ 82; *McHenry*, 2016 IL App (3d) 140913, ¶ 139; *Johnson*, 303 Ill. App. 3d at 705; *Schmidt*, 298 Ill. App. 3d at 690. Thomas does not dispute the applicability of the abuse-of-discretion standard in reviewing a trial court's determination as to the appointment of a guardian. Rather, he seeks application of what he terms a "nuanced" standard of review on grounds that the trial court "acted outside its jurisdiction" and "misapplied the law to these plenary guardianship proceedings for a disabled adult as if they instead concerned a modification of preexisting parental responsibilities for a minor child."

¶ 52     Thomas does not cite legal authority to support the concept of a "nuanced" standard of review. Rather, he points out: (1) "[w]hether a circuit court has subject matter jurisdiction *** presents a question of law which we review *de novo*" (see *McCormick v. Robertson*, 2015 IL 118230, ¶ 18); (2) "[w]here a trial court's exercise of discretion relies on an erroneous conclusion of law, *** our review is *de novo*" (see *Beehn v. Eppard*, 321 Ill. App. 3d 677, 680-81 (2001)); and (3) "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions" (see *Macknin v. Macknin*, 404 Ill. App. 3d 520, 530 (2010)). Distilled, Thomas's argument is that the trial court essentially adjudicated Brian's plenary guardianship pursuant to the standard in the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) for modification of a parenting agreement (see 750 ILCS 5/610.5(c) (West

2018)), rather than the standard in the Probate Act for appointment of a guardian (see 755 ILCS 5/11a-12(d) (West 2018)). Because Brian is an adult, Thomas argues that the trial court lacked jurisdiction to adjudicate the allocation of parental responsibilities and parenting time under the Dissolution Act.

¶ 53    Thomas likens this case to *In re Marriage of Dobbs*, 358 Ill. App. 3d 308 (2005), and *In re Marriage of Casarotto*, 316 Ill. App. 3d 567 (2000). In both cases, the appellate court held that the trial court lacked jurisdiction to order visitation between a parent and an adult disabled child pursuant to the Dissolution Act. *Dobbs*, 358 Ill. App. 3d at 311-313; *Casarotto*, 316 Ill. App. 3d at 571. Under the Dissolution Act, the trial court lacks jurisdiction to enter custody orders with respect to children who have attained the age of majority. *Dobbs*, 358 Ill. App. 3d at 310-11; *Casarotto*, 316 Ill. App. 3d at 571. Visitation is a form of child custody; therefore, the trial court lacked jurisdiction to enter a visitation order against a person who had attained the age of majority. *Dobbs*, 358 Ill. App. 3d at 311-313; *Casarotto*, 316 Ill. App. 3d at 571.

¶ 54    *Dobbs* and *Casarotto* are inapposite. The proceeding in this case was a proceeding under the Probate Act. Both parties filed petitions to be appointed Brian's plenary guardian. The trial court indisputably had jurisdiction pursuant to the Probate Act to appoint a guardian for Brian. See 755 ILCS 5/11a-12(d) (West 2018). Simply put, the underlying premise of Thomas's argument is flawed. A review of the appointment order reflects that the trial court properly applied the standards set forth in the Probate Act in appointing Lissette as the plenary guardian of Brian's person and estate. Indeed, the trial court explicitly articulated the standard for selection of a guardian as set forth in section 5/11a-12(d) of the Act. The trial court also delineated the factors to consider in determining whether the selection of the guardian is in the best interest and well-being of the person with a disability, citing *McHenry*, 2016 IL App (3d) 140913, ¶ 139, *Johnson*,

303 Ill. App. 3d at 705, and *Schmidt*, 298 Ill. App. 3d at 690. As discussed in further detail below, the trial court's recitation of the testimony and analysis of Brian's best interest and well-being reflect that these factors are precisely what the trial court considered in appointing Lissette as Brian's guardian.

¶ 55    Accordingly, we review the trial court's order appointing Lissette as Brian's plenary guardian for an abuse of discretion. See *Burdge*, 2018 IL App (5th) 170317, ¶ 82; *McHenry*, 2016 IL App (3d) 140913, ¶ 139; *Johnson*, 303 Ill. App. 3d at 705; *Schmidt*, 298 Ill. App. 3d at 690. Thus, we will not reverse the order unless the trial court's ruling was "arbitrary, fanciful, or unreasonable or unless no reasonable person would have taken the view adopted by the circuit court." See *Burdge*, 2018 IL App (5th) 170317, ¶ 82.

¶ 56    Preliminarily, we note that in his notice of appeal, Thomas sought reversal of the appointment order and remand for entry of a guardianship order in his favor. In contrast, in his briefs in this court, Thomas seeks reversal of the appointment order and requests this court to "act affirmatively to appoint the parties as co-guardians of Brian's estate and person" or, alternatively, to remand to the trial court with a "directive" or "recommendation" for co-guardianship. An appellant is required to specify in its notice of appeal the "relief sought from the reviewing court." Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017). "The filing of a notice of appeal is the jurisdictional step that initiates appellate review." *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 55. Nevertheless, the distinction in the requested relief does not impact our jurisdiction. *Cf. In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 32 (the failure to include a prayer for relief in the notice of appeal did not deprive the appellate court of jurisdiction).

¶ 57    The requested relief, however, reflects a misunderstanding of the scope of our review. The abuse-of-discretion standard of review recognizes that the trial court is in a superior position to

evaluate the evidence. *In re Marriage of Wade*, 158 Ill. App. 3d 255, 265-66 (1987). Thus, the question on review is whether any reasonable person could have taken the position adopted by the trial court, not whether the appellate court might have decided the issue differently. See *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006). With this standard in mind, we turn to the question of whether the trial court abused its discretion in appointing Lissette to serve as Brian's guardian.

¶ 58    The trial court recounted at length the trial testimony and evidence and turned to the primary consideration of the best interest and well-being of Brian. See 755 ILCS 5/11a-12(d) (West 2018); *McHenry*, 2016 IL App (3d) 140913, ¶ 141. The trial court considered the guardian *ad litem*'s recommendation that Thomas be appointed guardian but found that the guardian *ad litem* improperly focused her attention on the communication and interaction between Thomas and Lissette, rather than how change would affect Brian. The trial court also noted the guardian *ad litem*'s failure to consider information regarding Lissette's school and work performance.

¶ 59    The trial court pointed out that Brian had primarily resided with Lissette his entire life and explained that Brian's pediatrician, as well as the parties, agreed that routine, consistency, and stability are important for Brian. The trial court reasoned that Lissette had committed her whole life to raising of Brian and that her personal and work life centered around Brian, his condition, and his needs. Thomas did not dispute that Brian received appropriate medical and dental care, a good education, and a good upbringing. The trial court found that both Thomas and Lissette were involved in Brian's education and commended their upbringing of Brian. However, the trial court concluded any further change or disruption would be difficult for Brian, unnecessary for his care, and therefore not in his best interest.

¶ 60    Based upon our review of the record and notwithstanding the many positive attributes Thomas brings to the question, we cannot say that the trial court's appointment of Lissette as Brian's guardian was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the trial court's view. See *Burdge*, 2018 IL App (5th) 170317, ¶ 82. There was considerable testimony from family and third parties as to Lissette's devotion to Brian and their positive relationship. There was also testimony regarding Lissette's attention to Brian's educational, medical, and other needs notwithstanding difficult financial circumstances. The evidence established that Lissette worked in the field of special needs, received positive performance evaluations, and was in the process of earning a master's degree in special education. These are the precise considerations that weigh in support of a determination that the selection of a guardian is in the best interest and well-being of a person with a disability. See 755 ILCS 5/11a-12(d) (West 2018); *McHenry*, 2016 IL App (3d) 140913, ¶ 141.

¶ 61    Thomas nevertheless argues that the trial court's consideration of the fact that Brian had lived with Lissette his whole life imposed disparate burdens on the parties. Namely, Thomas maintains his argument that the trial court essentially required Thomas to establish a substantial change in circumstances warranting modification of a parenting agreement under the Dissolution Act. See 750 ILCS 5/610.5(c) (West 2018). We disagree. There was extensive evidence in the record regarding the need for routine, consistency, and stability for a person with autism. The trial court simply could not have considered Brian's best interest and well-being without considering his living arrangement for the past 18 years. Indeed, the fact that Brian lived primarily with Lissette for the past 18 years was directly relevant to the first and third factors set forth in *McHenry*—the degree of relationship between the disabled person and the proposed guardian and the conduct by

the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian. 2016 IL App (3d) 140913, ¶ 141.

¶ 62    Thomas also contends that the trial court failed to address Lissette's financial instability and what Thomas characterizes as Lissette's "desire for unmonitored access and use of Brian's Supplemental Security Income." Initially, we note that Thomas's record citations simply do not support this characterization of Lissette's testimony. Moreover, the argument ignores that the trial court retains jurisdiction to supervise a guardian under the Probate Act. See 755 ILCS 5/11a-17 (West 2018); *In re Estate of Nelson*, 250 Ill. App. 3d 282, 287 (1993). Indeed, the record reflects that Lissette signed an "Oath of Office," which was filed on October 28, 2019, certifying that she understood her "duty to annually report about the health and welfare" of Brian and the consequences for failure to comply with the duty.

¶ 63    As Thomas points out, there was undoubtedly evidence in the record regarding Thomas's devotion to Brian, commitment to his needs, and plans for Brian's future. However, the record demonstrates that the trial court considered the entirety of the evidence in its ruling. Thomas presents no persuasive basis upon which to conclude that the trial court's appointment of Lissette to serve as plenary guardian of Brian's person and estate was an abuse of discretion.

¶ 64                                B. Visitation Order

¶ 65    The trial court in a probate proceeding has inherent authority to set forth additional terms of the guardianship order. See *Nelson*, 250 Ill. App. 3d at 286-87. An additional term may include ordering visitation between a parent and a disabled adult. See *In re Guardianship of Huseman*, 358 Ill. App. 3d 299, 307 (2005); *Dobbs*, 358 Ill. App. 3d at 313. "Guardians only act as the hand of the court and are at all times subject to its direction in the manner in which they provide for the

care and support of the disabled person." *Nelson*, 250 Ill. App. 3d at 287. Accordingly, we review an order setting forth additional terms of a guardianship for an abuse of discretion. See *id.*

¶ 66 Thomas was explicit in his notice of appeal and in his briefs in this court that he challenges only the visitation schedule set forth in the November 22, 2019, order, and does not challenge any of the other provisions. However, he does not argue that the visitation schedule was an abuse of discretion. To the contrary, he acknowledges that challenging the order "involves risk" as it seems to "empower him to remain active and influential in Brian's life despite Lissette's guardianship authority." Indeed, a review of the order reflects that the trial court addressed the very concerns set forth by the guardian *ad litem* regarding the importance of Thomas's continued involvement in Brian's life.

¶ 67 Thomas's challenge to the visitation schedule is essentially a reiteration of his argument that the trial court's adjudication of Brian's plenary guardianship amounted to an improper exercise of jurisdiction under the Dissolution Act. See *Dobbs*, 358 Ill. App. 3d at 311-313; *Casarotto*, 316 Ill. App. 3d at 571. He argues that the provisions and terminology set forth in the November 22, 2019, order are concepts found in the Dissolution Act and not the Probate Act. Namely, Thomas was awarded "parenting time" rather than visitation.

¶ 68 Lissette argues that the provisions and terminology set forth in the November 22, 2019, order were merely derived from the proposal that the parties submitted in response to the trial court's direction to submit proposals on "a parenting time schedule and notification/communication order." Thomas challenges Lissette's reliance on the parties' proposals because they are not in the record. He explains that the proposals were not made part of the record because they were offered for the purpose of settlement negotiation and thus inadmissible. See Ill. R. Evid. 408(a) (eff. Jan 1, 2011) (offers to compromise and settlement

negotiations are generally inadmissible). We disregard Lissette's citation to the proposals but note that their content is not necessary to our resolution of the issue on appeal.

¶ 69    Regardless of the nomenclature, the trial court retains jurisdiction to enter additional terms of the guardianship. Indeed, "the very nature of this type of proceeding requires the court to retain jurisdiction to supervise the guardians appointed for a ward." *Nelson*, 250 Ill. App. 3d at 287. The trial court had jurisdiction to set the parenting time or visitation schedule that Thomas challenges. See *Dobbs*, 358 Ill. App. 3d at 313 ("The intended relief of granting visitation would, however, be available to the parties pursuant to the Probate Act."). Thomas presents no basis for reversal of the November 22, 2019, order.

¶ 70                              III. CONCLUSION

¶ 71    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 72    Affirmed.